In the

# United States Court of Appeals
## For the Seventh Circuit

―――――

Nos. 03-3277, 03-3278, 03-3279,
   03-3280, 03-3281 & 03-3865

TEXAS INDEPENDENT PRODUCERS AND
ROYALTY OWNERS ASSOCIATION, et al.,

*Petitioners,*

*v.*

ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

―――――

Petitions for Review of an Order of the
Environmental Protection Agency
No. 02-OW-55

―――――

ARGUED DECEMBER 7, 2004—DECIDED JUNE 13, 2005

―――――

Before BAUER, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.*    On July 1, 2003, the
Environmental Protection Agency issued its "Final National
Pollutant Discharge Elimination System General Permit for
Storm Water Discharges From Construction Activities"
("General Permit"). 68 Fed. Reg. 39,087 (July 1, 2003).

Several organizations filed petitions for review of this final agency action, and those petitions were consolidated before this court. For the reasons that follow, we hold that the General Permit does not violate the Clean Water Act's requirements for public notice and public hearing. We also hold that in issuing the General Permit, the Environmental Protection Agency complied with the requirements of the Endangered Species Act. However, petitioner Natural Resources Defense Council, Inc., lacks standing to challenge other aspects of the General Permit, and accordingly we dismiss the remainder of its petition. As to the remaining petitioners who represent the interests of the oil and gas industries, we stay consideration of their challenges to the General Permit pending resolution by the Fifth Circuit as to whether those petitioners are required to obtain a permit in the first instance.

## I.

Congress enacted the Clean Water Act ("CWA" or "Act")[1] "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits the "discharge of any pollutant" except in compliance with the Act's provisions. 33 U.S.C. § 1311(a). Under the Act's provisions, the discharge of pollutants into navigable waters is illegal unless authorized by a permit issued pursuant to § 402 of the Act. 33 U.S.C. § 1342. Section 402 established the National Pollutant Discharge Elimination System ("NPDES"), and requires dischargers to obtain

---

[1] An appendix to this opinion provides a comprehensive list of the numerous abbreviations used throughout the opinion.

a permit from the Environmental Protection Agency ("EPA") or an authorized state.[2] 33 U.S.C. § 1342(a)(1), (b).

The NPDES permitting system originally used individual permits, which was feasible for regulating discharges from wastewater facilities or industrial plants. However, by the 1980's it became clear that the individual permitting process was unworkable to regulate storm water discharges which can occur virtually anywhere. 56 Fed. Reg. 40948, 40949-50 (Aug. 16, 1991). Congress responded in 1987 by adding § 402(p) to the CWA. 33 U.S.C. § 1342(p). This section established a two-step phased approach to regulating storm water discharges. *See* 33 U.S.C. § 1342(p).

In Phase I, Congress required NPDES permits for storm water discharges from "industrial activities," 33 U.S.C. § 1342(p)(3)(A), defined as construction activities involving five or more acres, as well as discharges from certain large municipal storm sewer systems. 55 Fed. Reg. 47990, 48066 (Nov. 16, 1990). To implement the permit requirement for Phase I, the EPA decided to use a general permit system, as opposed to a system requiring individual permits for each construction activity. 55 Fed. Reg. 47,990, 48005-48006 (Nov. 16, 1990). With a general permit, the EPA issues a permit for specific types of activities and establishes specific rules for complying with the permit. Then, rather than apply for an individual permit, operators must file a Notice of Intent ("NOI") stating that they plan to operate under the general permit, and absent a negative ruling by the EPA, discharges that comply with the terms of the general permit are automatically authorized. The EPA uses a general permit

---

[2] "The EPA administers the NPDES program in each state unless the EPA previously authorized a state program to issue NPDES permits." *Am. Paper Inst., Inc. v. EPA*, 890 F.2d 869, 871 (7th Cir. 1989) (citing 33 U.S.C. § 1342(b)).

system to assure "adequate environmental safeguards . . . without the administrative and resource burdens involved in an individual permit issuance." 56 Fed. Reg. at 40961. The EPA issued its first general permit for construction-related storm water discharges in 1992, 57 Fed. Reg. 41176 (Sept. 9, 1992), and proposed a revised general permit in 1997. 62 Fed Reg. 29786 (June 2, 1997). Neither of these general permits is at issue in this case.

In preparation for Phase II, the EPA, as directed by Congress, studied all remaining storm water discharges and established "procedures and methods to control storm water discharges to the extent necessary to mitigate impacts on water quality." 33 U.S.C. § 1342(p)(5). Then, in 1999, the EPA issued its Phase II storm water rules, designating as Phase II sources small construction sites (one to five acres), smaller municipalities, and additional sources that might be designated on a case-by-case basis. 64 Fed. Reg. 68722 (Dec. 8, 1999); 40 C.F.R. § 122.26(b)(15).

On December 20, 2002, the EPA proposed a third General Permit for storm water discharges from both large and small construction sites.[3] 67 Fed. Reg. 78116 (Dec. 20, 2002). The General Permit applies only in those jurisdictions where the EPA has not authorized the State or Indian Tribe to administer its own NPDES permitting program. These jurisdic-

---

[3] Although the EPA imposed the NPDES permitting requirements on small construction sites (one to five acres) it was not required to do so by statute. Rather, Congress merely directed the EPA in Phase II to issue comprehensive regulations addressing additional discharges as necessary, by "performance standards, guidelines, guidance, and management practices and treatment requirements, as appropriate." 33 U.S.C. § 1342(p)(6). Accordingly, the EPA was not required to subject the smaller construction sites to the terms of the General Permit at issue here.

tions include Massachusetts, New Hampshire, Idaho, New Mexico, Alaska, and certain tribal lands. 33 U.S.C. § 1342(c).[4] After holding a series of public meetings and considering public comments, the EPA published notice of the final General Permit on July 1, 2003. 68 Fed. Reg. 39087.

The final General Permit issued by the EPA requires operators to submit an NOI to be covered by the General Permit, and mandates that a responsible corporate official certify the basis for eligibility for such coverage. General Permit, Appendix G at 11A.1. The General Permit also requires that the operator create, maintain, and implement a site-specific Storm Water Pollution Prevention Plan ("SWPPP"), which must also be certified by a corporate official. General Permit 3.13; General Permit, Appendix G at 11A.1. The discharger must further implement best management practices ("BMP") necessary to comply with water quality standards, assure weekly site inspections, and document those inspections, including detailing weather conditions. *See* General Permit 4.5A (construction operators must "select, install, and maintain BMPs at your construction site" that minimize pollutants in the discharges as necessary to meet applicable water quality standards); General Permit 3.10.A (detailing requirements for inspections).

Shortly before it published the final regulation for the General Permit, the EPA issued 68 Fed. Reg. 11325 (March 10, 2003). That final rule provided that "[d]ischarges associated with small construction activity at such oil and gas sites will require permit authorization by March 10,

---

[4]  The EPA also maintains that the General Permit applies to certain construction activities associated with oil and gas exploration in the States of Oklahoma and Texas.

2005." 68 Fed. Reg. at 11330.[5] On June 9, 2003, several organizations representing business interests in the oil and gas industry ("Oil and Gas Petitioners") filed a petition challenging that regulation in the Fifth Circuit. In their petition, the Oil and Gas Petitioners claimed that the EPA lacks authority to require storm water discharge permits for oil and gas construction activities based on § 402(l)(2) of the CWA. In § 402(l)(2), Congress expressly prohibited the EPA from requiring a § 402 permit for storm water discharges for oil and gas activities unless the discharges were contaminated by contact with materials located on the site of such operations. 33 U.S.C. § 1342(l)(2).[6] That petition is still pending before the Fifth Circuit. *See Indep. Petro v. EPA*, No. 03-60506 (5th Cir. oral argument Jan. 31, 2005).

In addition to challenging the EPA's proposed final rule, arguing that they are exempt from the permit requirements, the Oil and Gas Petitioners filed a petition for review of the

---

[5] The EPA has since postponed the effective date to June 12, 2006. 70 Fed. Reg. 11560 (March 9, 2005).

[6] Section 402(l)(2) provides:

> The Administrator shall not require a permit under this section, nor shall the Administrator directly or indirectly require any State to require a permit, for discharges of storm water runoff from mining operations or oil and gas exploration, production, processing, or treatment operations or transmission facilities, composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and which are not contaminated by contact with, or do not come into contact with any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations.

terms of the General Permit in the Fifth Circuit. The Natural Resources Defense Council ("NRDC"), an environmental advocacy organization, also filed a petition for review of the General Permit. That petition was filed before this court. The Oil and Gas Petitioners' petition was consolidated with the NRDC petition pending in this court, and leave was granted the National Association of Home Builders, the Wisconsin Builders Association, and the Associated General Contractors of America (collectively "Builder Groups"), to intervene in support of the General Permit regulation.

## II.

On appeal, petitioner NRDC raises three main arguments. First, the NRDC argues that the General Permit violates the mandates of the CWA by "authorizing the discharge of pollutants without ensuring that the discharge will meet the water quality and technology requirements of the CWA." Second, the NRDC challenges the "General Permit's failure to mandate public availability of the NOI and the SWPPP, as well as its failure to provide the public with the opportunity for a public hearing on the NOI and the SWPPP. . . ." Third, the NRDC claims that the General Permit violates the Endangered Species Act ("ESA"). 16 U.S.C. §§ 1531, *et seq.*

For their part, the Oil and Gas Petitioners first reiterate their position that the storm water permit requirements do not apply to construction activities in the oil and gas industry. The Oil and Gas Petitioners maintain, however, that in this appeal, they are not challenging the EPA's decision that they must obtain storm water discharge permits, as that question is currently pending before the Fifth Circuit. Rather, the Oil and Gas Petitioners assume, for purposes of this appeal, that they must obtain a permit, and instead they challenge the requirements of the General Permit estab-

lished by the EPA in 68 Fed. Reg. 39,087. Specifically, the Oil and Gas Petitioners argue that the EPA's definition of "common plan" contained in the General Permit is so broad, ambiguous, and vague that it violates their rights to due process because they do not know if they need to apply for a General Permit. The Oil and Gas Petitioners also argue that the EPA's definition of "final stabilization" is too vague. Alternatively, the Oil and Gas Petitioners argue that the EPA's definitions of "common plan" and "final stabilization" are arbitrary and capricious because the definitions do not take into account the differences in construction activities related to oil and gas exploration and conventional residential and commercial activities.

The State of Louisiana's Department of Natural Resources, the Railroad Commission of the State of Texas, and the State of Oklahoma's Corporation Commission filed *amici curiae* briefs in support of the Oil and Gas Petitioners. The *amici* support the Oil and Gas Petitioners' claims that the EPA acted arbitrarily and capriciously in failing to tailor the permit criteria to construction activities in the oil and gas industries. The *amici* also highlight the importance of the oil and gas industries to their States' economies, and stress that their States currently address environmental concerns related to the oil and gas industry.

In the cross-fire is the EPA, which maintains the middle ground, asserting that it acted reasonably in adopting the General Permit and that the regulations are neither too harsh nor too lax. The Builders Group supports the EPA's position, submitting a brief as Intervening Respondents to oppose the claims asserted by the NRDC. We begin by addressing the arguments presented by the NRDC, and then consider the Oil and Gas Petitioners' claims.

### A.  The NRDC's Petition

### 1.  Standing.

Before we can address the merits of the NRDC's arguments, however, we must first determine whether the parties have standing to sue, an issue raised by the Builders Group, but one this court must in any event, determine in the first instance.[7] *See Heartwood, Inc. v. United States Forest Serv.*, 230 F.3d 947, 951 (7th Cir. 2000) ("As always, before the court may consider the merits of a case, we must determine whether Plaintiffs have presented a justiciable claim.").

Section 509(b)(1)(F) of the CWA authorizes any "interested person" to obtain review of an EPA action in a Circuit Court of Appeals. 33 U.S.C. § 1369(b)(1)(F). To qualify as an "interested person" under § 509(b)(1)(F), a party, at a minimum, must have Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (hereinafter *Lujan II*). When a plaintiff is an association, the association has Article III standing to represent the interests of its members if the individuals have standing in their own right; the interests represented are germane to the association's purpose; and the relief sought does not require the participation of the individual members. *Hunt v. Wash. State Apple Adv. Comm'n*, 432 U.S. 333, 343 (1977). *See, e.g., Sierra Club v. Marita*, 46 F.3d 606, 611-12 (7th Cir. 1995) (holding that "Sierra Club

---

[7]  The NRDC claims that it need not establish standing unless or until it is challenged. However, this court admonished litigants in *Rhodes v. Johnson*, 153 F.3d 785, 787 (7th Cir. 1998), to "be mindful of our obligation to satisfy ourselves of our jurisdiction and when, in cases like this, standing is an obvious issue, . . . they [should] cite to the relevant parts of the record to avoid wasting judicial time and resources."

may maintain standing on behalf of its members"). Plaintiffs, as the parties invoking federal jurisdiction, have the burden of proof and persuasion as to the existence of standing. *Lujan II*, 504 U.S. at 561.

At oral argument, we directed the NRDC to file a supplemental brief addressing whether it satisfied these requirements. In its supplemental brief, the NRDC asserts that it has standing to sue on behalf of its members as the interests involved are germane to the association's purpose, and the relief sought does not require the participation of individual members. No one takes issue with those propositions. The only real question is whether the individual members would have standing to sue in their own right. The NRDC claims that it has identified three members who have standing in their own right by virtue of living near and making use of "water bodies that receive storm water discharges authorized" by the General Permit. To determine whether this is sufficient, we turn then to the requirements for individual standing in general and, specifically, standing in an environmental case.

Generally, to establish standing a petitioner must demonstrate an injury in fact; a causal link between the injury and the challenged action; and redressability through a favorable court decision. *Id.* at 560-61; *see also Area Transp., Inc. v. Ettinger*, 219 F.3d 671, 672 (7th Cir. 2000). However, when, as here, "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed." *Lujan II*, 504 U.S. at 562 (emphasis in original). As the Supreme Court in *Lujan II* explained, that is because in such a situation, "causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Id.* Thus, the plaintiff must "adduce facts

showing that those choices have been, or will be, made in such manner as to produce causation and permit redressability of injury." *Id.* Accordingly, as *Lujan II* explained, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Id.* (internal quotations omitted).

Notwithstanding this difficult standard, the NRDC maintains that it has standing to challenge the General Permit because three of its members use various bodies of water which are polluted and that the pollution lessens their enjoyment and use of the water bodies. The NRDC asserts that that is enough to establish environmental standing, citing numerous environmental cases holding that such an interest is sufficient.

The NRDC is correct that injury to recreational or aesthetic interests constitutes a cognizable injury for purposes of standing. *See Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167, 183 (2000) (stating that injury to aesthetic and recreational values constitutes sufficient injury for standing); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990) (hereinafter *Lujan I*) ("We have no doubt that 'recreational use and aesthetic enjoyment' are among the *sorts* of interests those statutes were specifically designed to protect."). However, to establish standing, the NRDC must establish not just " 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized,' " but also that there is "a causal connection between the injury and the conduct complained of . . . ." *Lujan II*, 504 U.S. at 560. In other words, "the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Id.*

Simply put, the NRDC must tie the asserted injury, namely its members' reduced aesthetic and recreational enjoyment, to the challenged conduct, namely the EPA's issuance of the General Permit. The NRDC asserts its members "will be directly affected by the General Permit," as it "has members in each of the states in which construction activities will be regulated by the General Permit," and that its "members swim and engage in other recreational activities in water bodies directly affected by pollution from construction activities subject to the General Permit." These contentions, however, fail to establish the requisite casual connections for standing for numerous reasons.

Initially, we note that the NRDC fails to adduce specific facts in its proffered affidavits to support its claim that the water bodies are "directly affected by pollution from construction activities subject to the General Permit." Rather, in the three affidavits presented in the NRDC's reply brief to establish standing, the members merely repeat the conclusory allegations of the NRDC's opening brief. For instance, one affiant stated: "In recent years, there has been much construction activity near the waters that I use in Idaho. . . . I believe that that [sic] these construction projects contribute to sediment, turbidity and water quality problems in the Boise River, Snake River, and Clearwater River." However, the affidavit fails to identify any specific construction project authorized under the General Permit to discharge into these bodies of water, and more significantly it fails to present evidence that discharges of sediment from the sites are actually occurring. Similarly, a second affidavit merely states: "The construction that has been occurring in and around Taos has negatively affected water quality and harmed me and my family in the process." Again, this conclusory statement does not identify any specific construction sites authorized under the General Permit and fails to present evidence of any discharges into the water bodies

at issue. Finally, although the third affidavit identifies a construction project approved under the EPA's General Permit, that affidavit does not specify any discharge from that project into the water body at issue.[8] As petitioning party, the NRDC bears the burden of proof, *Lujan II*, 504 U.S. at 561, and because it has sought a ruling as a matter of law, it must present record evidence establishing standing. *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002). Repeating the conclusory allegations of a complaint is not enough. *Lujan I*, 497 U.S. at 888. Yet that is what the NRDC has done, opining that the construction activities result in pollution, without citing any supporting evidence.

The NRDC seeks to overcome the deficiencies in the affidavits by citing in its Supplemental Brief to several NOIs filed with the EPA, including some from construction companies providing a notice of an intent to discharge under the General Permit in the bodies of water used by the three affiants. There are several problems with this approach. First, the water bodies at issue span, in some cases, hundreds of miles. For instance, the Rio Grande runs the entire length of New Mexico, and pointing to an NOI seeking coverage under the General Permit for discharges into the Rio Grande does not establish an injury to the portion of the river used by the affiant. This is fatal, as "averments which state only that one of respondent's members uses unspecified portions of an immense tract of territory, on some portions of which [regulated] . . . activity has occurred or probably will occur by virtue of the governmen-

---

[8] Ironically, while the affiants conclusorily declare that discharges from the construction sites pollute the water bodies at issue, the NRDC's acknowledgment in its brief that it cannot "determine which point-sources might be responsible for harmful discharges" calls into question the veracity of these declarations.

tal action, are insufficient to show that the member's rights have been adversely affected or aggrieved by Government action." *Lujan I*, 497 U.S. at 889. Moreover, to satisfy the "fairly traceable" causation requirement, there must be a distinction between "the plaintiffs who lie within the discharge zone of a polluter and those who are so far downstream that their injuries cannot fairly be traced to that defendant." *Friends of the Earth, Inc. v. Gaston Copper Recy., Corp.*, 204 F.3d 149, 162 (4th Cir. 2000). *See also Lujan II*, 504 U.S. at 565-66 ("[P]laintiffs claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it."). Thus, for instance, the Fifth Circuit held in *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 360-61 (5th Cir. 1996), that an eighteen-mile distance is "too large to infer causation." Likewise here, where the specific water bodies used by NRDC members run a great distance, pointing to NOIs that authorize discharges in those water bodies is insufficient to establish the discharges are within the zone to infer causation. *See Lujan I*, 497 U.S. at 887-89.

Second, the NOIs relied upon by the NRDC do not establish that any discharge has actually occurred into the water bodies. *See, e.g.*, 69 Fed. Reg. 76743, 76746 (Dec. 22, 2004) (In discussing the General Permit, the EPA characterizes the CWA and its implementing regulations as requiring "certain *potential* dischargers to seek permit coverage."). Nor do any of the affidavits filed present evidence of the discharge of pollutants. "[I]t will not do to 'presume' the missing facts because without them the affidavits would not establish the injury that they generally allege." *Lujan I*, 497 U.S. at 889. Additionally, even if discharges were occurring into the water bodies, the NRDC must still trace the alleged polluted conditions of the water bodies to the discharges. Although a plaintiff need not establish such a nexus with

"scientific certainty," *Gaston Copper*, 204 F.3d at 161, a plaintiff must show "that a defendant discharges a pollutant [which] causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." *Id.* (internal citations omitted). In *Gaston Copper*, the Fourth Circuit noted that "[w]here a plaintiff has pointed to a polluting source as the seed of his injury, and the owner of the polluting source has supplied no alternative culprit, the 'fairly traceable' requirement can be said to be fairly met." *Id.* at 162. Here, however, the NRDC failed to establish "any seed of [its] injury." The NRDC also ignores the existing polluted condition of at least three of the water bodies, the Anacostia and Potomac Rivers, and Rock Creek, in Washington D.C. This condition is in large part caused by the "estimated 3.2 billion gallons of untreated raw sewage that flows into the rivers each year from the area's sewer systems." Department of Justice Press Release, U.S. - WASA Sewage Settlement to Clean up D.C.'s Anacostia River, December 16, 2004.

Finally, and most significantly, pointing to NOIs filed with the EPA is insufficient because for the NRDC to have standing to sue, it is not enough to assert that water bodies used by its members receive storm water discharges authorized by the General Permit. Rather, the NRDC must show that the discharge caused the complained-of legally cognizable aesthetic or recreational injury. Establishing a discharge does not also establish an injury. That is because the EPA "may issue permits authorizing the discharge of pollutants in accordance with specified conditions," and such authorized discharges are not illegal. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52 (1987) (citing 33 U.S.C. § 1342). Therefore, to establish causation and, in turn, standing, the NRDC must establish

that the discharge violated the General Permit or the terms of the CWA. The NRDC has established neither.

This distinguishes our case from those relied upon by the NRDC wherein the courts found environmental standing, as those cases alleged aesthetic and recreational injuries caused by violations of a permit. For instance, in *Laidlaw* the plaintiffs sued for injunctive relief for alleged violations of an NPDES permit by a hazardous waste incinerator. The Supreme Court found standing in *Laidlaw*, reasoning: "[I]t is undisputed that Laidlaw's unlawful conduct—discharging pollutants in excess of permit limits—was occurring at the time the complaint was filed." *Laidlaw*, 528 U.S. at 184. Similarly, in *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1146 (9th Cir. 2000), the Ninth Circuit held the plaintiffs had standing because they alleged that their individual members used the water bodies at issue and that their aesthetic and recreational interests were impaired by the alleged violations of the 1992 General Permit. Likewise in *Gaston Copper*, 204 F.3d at 156, the Fourth Circuit held that the plaintiff had standing to sue because the plaintiff was "a property owner whose lake lies in the path of Gaston Copper's toxic chemical discharge. He and his family swim and fish in this lake. [Plaintiff] testified that he and his family swim less in and eat less fish from the lake because of his fears of pollution from Gaston Copper's permit *exceedances*." (emphasis added). The court in *Gaston* continued: "Plaintiff here established the required nexus for the alleged injury by presenting evidence consisting of reports show[ing] over 500 violations of the company's discharge limits, including unlawful releases of cadmium, copper, iron, lead and zinc, as well as pH violations." *Id.* at 157 (internal quotation omitted).

Conversely, in this case, the NRDC does not assert any violation of the General Permit. The NRDC responds that it

need not establish a violation of the General Permit because it is attacking the General Permit scheme and not a specific discharge. However, to attack the General Permit scheme, the NRDC must still establish standing, which means the petitioner must demonstrate its members suffered an injury from the General Permit scheme. Yet the only potential injury to its members is one that could occur in the future should a contractor violate the terms of the General Permit.

Moreover, it would be illogical to hold that a petitioner has standing to challenge a General Permit *scheme* because a discharger *may* in the future violate the terms of the permit, where the Supreme Court has held that a citizen lacks standing to sue for *actual* violations of a permit where the discharger corrects the violation within the sixty-day notice period.[9] *See Atlantic States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 825 (7th Cir. 1997) ("In *Gwaltney*, the Supreme Court set forth a test for standing under the Act: a plaintiff must make a 'good-faith allegation of continuous or intermittent violation.' 484 U.S. at 64, 108 S.Ct. at 385. This means that a citizen plaintiff does not have standing to maintain a suit for civil penalties for wholly past violations of the act.") (citing *Gwaltney*, 484 U.S. at 54).

Allowing an attack on the General Permit scheme where no actual violation has occurred also defeats the goal of the regulatory provisions requiring that the notice of a permit violation provide the alleged discharger with specific details so the discharger knows what it is doing wrong and what

---

[9] Section 1365(b)(1)(A) authorizes private suits for violations of the terms of an existing NPDES permit, but "[c]itizens may not bring suit, however, unless and until they have given 60 days' notice of their intent to sue to the alleged violator (as well as the Administrator and the state)". *Atlantic States*, 116 F.3d at 818 (citing 33 U.S.C. § 1365(b)(1)(A)).

corrective actions will avert a lawsuit. *Id.* Where there is no alleged violation, the dischargers have no opportunity to take corrective action, as Congress and the EPA desired. *Gwaltney*, 484 U.S. at 60 (stating that the sixty-day notice requirement provides the alleged violator "an opportunity to bring itself into compliance with the Act and thus likewise render unnecessary a citizen suit"). Moreover, allowing such suits would conflict with Congress' intent that "the great volume of enforcement actions be brought by the State," and with Congress' design that citizen suits be brought only "if the Federal, State, and local agencies fail to exercise their enforcement responsibility." *Ailor v. City of Maynardville, Tenn.*, 368 F.3d 587, 598 (6th Cir. 2004) (quoting S. Rep. No. 92-414, p.64 (1971)).

Of course, that does not mean that the NRDC would be without standing to challenge a discharge that complies with the terms of the General Permit but violates the terms of the CWA. Such a discharge would be illegal, whether or not the EPA authorized it. Some language from the NRDC's briefs could be read as presenting such an argument. For instance, in its reply brief, the NRDC frames the issue as whether the EPA has "authority to issue a General Permit that authorizes discharges that do not comply with the law." However, the NRDC has presented no evidence of a discharge authorized by the General Permit that violates the terms of the CWA. The NRDC's other briefs also demonstrate that that is not the NRDC's real contention. Rather, the NRDC's complaint is that the General Permit scheme allows for the possibility that a contractor may violate the terms of the General Permit. But to have standing to present such a claim premised on a third party's action or inaction, the NRDC must adduce facts showing that "those choices have been, or will be, made in such manner as to produce causation and permit redressability of injury." *Lujan II*, 504

U.S. at 562. This it has failed to do. Therefore, it lacks standing to challenge the substantive provisions of the General Permit.

Because the NRDC has failed to establish standing to present its substantive challenges to the General Permit, this court lacks jurisdiction to consider the NRDC's objections to the General Permit scheme. Thus, its reliance on decisions from the Ninth and Second Circuits addressing the validity of other General Permit schemes is misplaced. Specifically, the NRDC cites the Ninth Circuit's decision in *Environmental Defense Center, Inc. v. EPA*, 344 F.3d 832 (9th Cir. 2003),[10] and the Second Circuit's decision in *Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486 (2d Cir. 2005),[11] in support of its challenge to the General Permit scheme. However, neither the Ninth nor the Second Circuit addressed the initial question of standing, at least as to whether environmental plaintiffs not subject to the regulation have standing to challenge the general permit.[12] Without standing, this court cannot reach

---

[10] In *Envirnomental Defense Center*, the Ninth Circuit considered a general permit authorizing municipal storm water discharges. 344 F.3d 832.

[11] In *Waterkeeper*, the Second Circuit considered the validity of a general permit authorizing discharges by Concentrated Animal Feeding Operations. 399 F.3d 486.

[12] The Second Circuit did not address the issue of standing at all. *Waterkeeper Alliance*, 399 F.3d 486. The Ninth Circuit addressed standing in considering challenges to the general permit presented by the industries subject to the permit requirements, and it concluded those petitioners lacked standing. *Environmental Defense*, 344 F.3d at 863, 867-68. The Ninth Circuit, however, did not mention the question of whether the environmental petitioners had standing. The Ninth Circuit did hold that the en-

(continued...)

the merits of the petitioner's substantive challenges to the General Permit. *In the Matter of Memorial Estates, Inc.*, 950 F.2d 1364, 1369 (7th Cir. 1991).

Whether the NRDC has standing to present procedural challenges to the General Permit, namely by attacking the General Permit's failure to mandate public availability of the NOI and SWPPP, and its failure to provide the public with the opportunity for a public hearing on the NOI and the SWPPP, however, is a separate question. Here the NRDC seeks to vindicate procedural rights established by statute to participate in the process. "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan II*, 504 U.S. at 572 n.7. *Lujan II* illustrated this point, noting that individuals living adjacent to a site for proposed construction have standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though they "cannot establish with any certainty that the

---

[12] (...continued)
vironmental petitioners' claim was ripe, noting that "we are addressing whether the EPA, in promulgating the Phase II Rule, has accomplished the substantive controls for municipal storm-water that Congress mandated in § 402(p) of the Clean Water Act, . . . [and that] question is ripe for review." *Id.* at 852 n.30. Although ripeness and standing overlap in some respects, in passing on ripeness, as the above excerpt demonstrates, the Ninth Circuit failed to consider whether the Phase II Rule at issue in that case caused an actual injury to the environmental petitioners. *Id.* at 852 n.30. That is significant because, as the above analysis demonstrates, the NRDC lacks standing to challenge the General Permit at issue in this case because it failed to present sufficient evidence that the General Permit caused a legally cognizable injury to any of its members.

statement will cause the license to be withheld or altered and even though the dam will not be completed for many years." *Id.* This court also recognized standing to vindicate a procedural right in *Sierra Club v. Marita*, 46 F.3d 606 (7th Cir. 1995), holding that the plaintiffs had standing to challenge a forest management plan because "[o]nce the plan has passed administrative review, the procedural injury has been inflicted, [and] [u]nless a plaintiff's purported interest in the matter is wholly speculative, waiting any longer to address that injury makes little sense." *Id.* at 612.

So too here: Even though the NRDC members cannot establish the immediacy of an injury from construction activities operating under the General Permit, the NRDC nonetheless has standing to challenge the EPA's failure to mandate public availability of the NOI and the SWPPP, and its failure to provide the opportunity for a public hearing related to the NOI and the SWPPP. This is because the NRDC has presented evidence that its members use water bodies that may receive discharges authorized by the General Permit and the three affiants stated that they would participate in the decision making process if allowed.

This contrasts with the *Lujan II* case in which, after reaffirming the principle of procedural standing, the Supreme Court nonetheless held that the plaintiffs lacked standing to present such a challenge because they failed to satisfactorily establish their future use of the property affected by the alleged procedural violation. *Lujan II*, 504 U.S. at 564, 572-73. Conversely, here, the NRDC members stated that they regularly use the water bodies. Accordingly, the NRDC has procedural standing. *See Rhodes*, 153 F.3d at 787 (holding that the plaintiffs have standing because they alleged they used the forest at issue and that the Forest Service's decision would diminish this use and enjoyment, and "that the defendant's failure to permit them to participate in the

public review of the decision is causally connected to their harm"); *Heartwood*, 230 F.3d at 952 (holding that under *Rhodes*, plaintiffs had standing to challenge the Forest Service's exclusion of certain classes of actions from procedural safeguards designed to determine the environmental impact of those actions, and that plaintiffs had an informational injury justifying standing as well, where the alleged violation prevented them from commenting on or challenging the agency's decision).

### 2.   Public notice and hearing.

Having concluded that the NRDC has standing to pursue its procedural injury claims, we turn to the merits of those claims. As noted above, the NRDC presents two procedural challenges: the NRDC challenges the General Permit's failure to mandate public availability of the NOIs and the SWPPP, and its failure to provide the public with the opportunity for a public hearing on the NOI and the SWPPP. In support of its position, the NRDC cites 33 U.S.C. §§ 1342(j) and 1342(1)(a).

Section 1342(j) of the CWA provides that "[a] copy of each permit application and each permit issued under this section shall be available to the public. Such permit application or permit, or portion thereof, shall further be available on request for the purpose of reproduction." Section 1342(a)(1) authorizes the EPA "after opportunity for public hearing, [to] issue a permit for the discharge of any pollutant, or combination of pollutants. . . ." The NRDC claims this statutory language requires the EPA to make the NOIs and SWPPPs publicly available and to provide for the opportunity for a public hearing. The EPA responds that Sections 1342(j) and 1342(a)(1) do not apply to the NOIs and

SWPPPs because NOIs and SWPPPs are neither permits nor permit applications.

This presents an issue of statutory interpretation, which is governed by the two-step test set forth in *Chevron U.S.A., Inc. v. National Resource Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). Under the first step, a reviewing court must determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If Congress' intent is clear from the statutory language, a court must "give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. However, if the statute is "silent or ambiguous with respect to the specific issue," the court must decide whether the Agency's interpretation is based on a permissible construction of the statute. *Id.* at 843. To uphold an agency's interpretation of a statute, this court need only find the interpretation permissible. *Id.*

The statutory language quoted above speaks only to "permits" and "permit applications," and not NOIs or SWPPPs. Thus, Congress has not spoken directly to the precise question at issue, or at best, it is ambiguous as to whether Congress intended to treat NOIs and SWPPPs as permits or permit applications for purposes of Sections 1342(j) and 1342(a)(1). Accordingly, under *Chevron*, we must decide whether the EPA gave a permissible construction to the term "permit applications" and "permits."

Maintaining that NOIs and SWPPPs do not constitute "permit applications" or "permits" for purposes of Sections 1342(j) and 1342(a)(1), the EPA stresses that the General Permit scheme does not make use of a permit application. Rather, general permits are proposed through a notice in the Federal Register, and the EPA solicits and receives public comments on the proposed general permits. It is at that time that the public has the opportunity to request a public

hearing. Once a general permit issues, a discharger wishing to operate under the general permit must comply with the previously established permit terms. Therefore, according to the EPA, there is no need for additional public comment or a notice period. Moreover, the EPA maintains that requiring "an additional public hearing on each individual NOI and SWPPP would eviscerate the administrative efficiency inherent in the general permitting concept," in effect making the general permit scheme no different from the process for obtaining individual permits. This would be inconsistent with Congress' intent to allow for the use of general permits. *See* Pub. L. 102-240 (Dec. 18, 1991) ("The Administrator shall issue final regulations with respect to general permits for storm water discharges associated with industrial activity on or before Feb. 1, 1992."). These rationales are eminently reasonable. Therefore, we conclude that the EPA's interpretation of the terms "permit application" and "permit" as not including NOIs and SWPPPs is a permissible construction. Under the EPA's interpretation, then, NOIs and SWPPPs are not subject to the requirements of Sections 1342(j) and 1342(a)(1), and, accordingly, the EPA did not violate those sections of the CWA in issuing the General Permit at issue.[13]

---

[13] The Ninth Circuit's majority opinion in *Environmental Defense Center* found under step one of *Chevron* that Congress clearly intended NOIs to be subject to the public availability and public hearing requirements because NOIs are the functional equivalent of a permit application. 344 F.3d at 856. However, as discussed above, the statutory language at issue addresses only "permit applications" and fails to include any mention of NOIs, SWPPPs, or other so-called "functional equivalents." Thus, as the dissent in *Environmental Defense Center* concludes, the majority erred in concluding that Congress clearly spoke to the issue. *Id.* at 880-81 (Tallman, J., dissenting). Because this opinion creates a split

(continued...)

### 3. Endangered Species Act.

Finally, the NRDC claims that the General Permit violates Section 7 of the Endangered Species Act ("ESA"). 16 U.S.C. §§ 1531, *et seq*. Section 7 requires each federal agency to ensure that any action authorized, funded, or carried out by that agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). The relevant regulations further require any agency proposing an action to pursue either informal or formal consultation with the Fish and Wildlife Service and/or the National Marine Fisheries Service (together "Service") if the proposed federal action "may affect" a threatened or endangered species. 50 C.F.R. § 402.14(a).

The NRDC claims that the General Permit violates Section 7 because the EPA does not consult with the Service upon receipt of an NOI and the completion of a SWPPP. Again, we begin by considering the NRDC's standing. As above, the NRDC's claimed injury here is a procedural injury—the lack of statutorily required consultation. Therefore, the standing requirements are more relaxed. In this case, the NRDC alleged that some of its members use bodies of water which endangered species inhabit, and that pollution threatens the proliferation of these species. For at least one of the members, a claimed harm exists: Affiant Justin Hayes claims his use and enjoyment of the water bodies is dimin-

---

[13] (...continued)
between the circuits, we circulated it in advance of publication to the full court pursuant to Seventh Circuit Rule 40(e). No judge in active service voted to hear the case en banc. (Chief Judge Flaum and Judge Ripple did not participate in consideration of whether to hear the case en banc.)

ished because the polluted conditions prevent endangered fish species from flourishing, which means that he cannot keep the fish he catches, but must instead release them back into the water. Given that the claimed harm is a procedural injury stemming from the EPA's failure to consult with the Service, we conclude the NRDC has standing to challenge the lack of consultation. *See supra* at 20-22.

However, on the merits the NRDC loses because Section 7 only requires consultation with the Service whenever *a federal action* "may affect" a threatened or endangered species. 16 U.S.C. § 1536(a)(2). A private actor, however, files an NOI and creates a SWPPP, and neither the filing of an NOI nor the creation of a SWPPP by a private contractor requires any federal action. Without a federal action, the consultation requirements of Section 7 are not triggered. Therefore, the EPA need not engage in consultation with the Service every time an NOI is filed or a SWPPP is prepared. Consultation was required earlier, when the EPA issued the General Permit, but at that time the EPA undertook and concluded informal consultation with the Service on the issuance of the General Permit. Specifically, the EPA and the Service developed a detailed procedure designed to accommodate listed species and critical habitats and the Service agreed that the issuance of the General Permit was not likely to adversely affect those species and habitats. Accordingly, the EPA complied with the ESA in issuing the General Permit. *See* 50 C.F.R. § 402.13 (explaining that the consultation requirement is satisfied if during the informal consultation the Service concurs in writing that the action "is not likely to adversely affect" a listed species).

**B.  Oil and Gas Petitioners**

The Oil and Gas Petitioners also challenge the terms of the General Permit, taking issue with various definitions and provisions, arguing in essence that the EPA acted arbitrarily and capriciously by failing to take into account the differences in construction activities related to oil and gas exploration and conventional residential and commercial activities. However, as noted above, the Oil and Gas Petitioners also maintain that the EPA lacks the authority to require a permit for construction activities related to oil and gas exploration. That question is currently pending before the Fifth Circuit. The Oil and Gas Petitioners acknowledge that should the Fifth Circuit rule in their favor, their claims would be moot. We agree. Accordingly, we stay consideration of the Oil and Gas Petition until the Fifth Circuit determines the initial question of whether the Oil and Gas Petitioners are subject to the permitting requirements of the CWA. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (stating that "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants); *Aetna State Bank v. Altheimer*, 430 F.2d 750, 755 (7th Cir. 1970) ("A stay pending the outcome of litigation in another court between the same parties, involving the same or controlling issues is an acceptable means of avoiding unnecessary duplication of judicial machinery.").

## III.

In sum, we conclude that the NRDC lacks standing to challenge the terms of the General Permit because it has failed to show any of its members have standing to sue in their own right; the NRDC failed to present evidence establishing the General Permit caused an actual injury to the aesthetic or recreational interests of its members. How-

ever, the NRDC has standing to present its procedural challenges to the General Permit, but those challenges fail because NOIs and SWPPPS are not permits or permit applications and therefore the CWA's public notice and hearing requirements do not apply. Likewise, while the NRDC has standing to present a procedural ESA claim, that claim fails on the merits because the filing of an NOI and the creation of a SWPPP by a private actor does not constitute "federal action," and, therefore, the consultation requirements of the ESA are not implicated. Accordingly, we DENY the NRDC's PETITION FOR REVIEW, IN PART, and DISMISS IT IN PART FOR LACK OF STANDING. We further STAY consideration of the Oil and Gas Petitioners' petition pending a decision from the Fifth Circuit as to whether the permit requirements of the CWA apply to the Oil and Gas Petitioners.

*Appendix:*

| | |
|---|---|
| The Act: | The Clean Water Act |
| BMP: | Best Management Practices |
| Builder Groups: | National Association of Home Builders, the Wisconsin Builders Association, and the Associated General Contractors of America |
| CWA: | The Clean Water Act |
| EPA: | The Environmental Protection Agency |
| ESA: | Endangered Species Act |
| General Permit: | Final National Pollutant Discharge Elimination System General Permit for Storm Water Discharges From Construction Activities |
| NRDC: | Natural Resources Defense Council |
| NOI: | Notice of Intent |
| NPDES: | The National Pollutant Discharge Elimination System |
| Oil and Gas Petitioners: | Texas Independent Producers and Royalty Owners Assocation; Independent Petroleum Association of America, U.S. Oil and Gas Association, Texas Alliance of Energy Producers, Louisiana Oil and Gas Associations, Independent Gas and Gas Association of Pennsylvania, Ohio Oil and Gas Association, and Oklahoma Independent Petroleum Association |
| SWPPP: | |

Storm Water Pol-
lution Prevention
Plan

A true Copy:

      Teste:

              _____

              *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*