**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**June 16, 2005**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 03-60506

---

TEXAS INDEPENDENT PRODUCERS AND ROYALTY OWNERS ASSOCIATION, et al.,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

---

ON PETITION FOR REVIEW FROM THE ENVIRONMENTAL PROTECTION AGENCY

---

Before JOLLY, DAVIS and CLEMENT, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Petitioners filed their petition to review a final rule promulgated by the Environmental Protection Agency (EPA) issued under the Clean Water Act (CWA). The appeal was taken from Final Rule 70 FR 2832, which deferred the National Pollution Discharge Elimination System (NPDES) permit requirement for certain oil and gas construction sites until March 10, 2005. Since then, EPA has promulgated Final Rule 40 CFR Part 122 on March 9, 2005, which further delays the date by which small oil and gas construction sites must obtain permits until June 12, 2006. For the reasons

-1-

that follow, we conclude that Petitioners lack standing and we dismiss the petition.

                                I.

In 1987, Congress amended the CWA to establish two separate phases for the regulation of stormwater discharges. 33 U.S.C. § 1342(p). Phase I required EPA to establish a permit program for certain dischargers, which EPA defined to include construction sites that disturb more than five acres of land. These major source dischargers of stormwater were defined by geographic criteria, without regard to actual contamination.

Phase II required EPA to investigate other storm water discharges and to create a comprehensive program to regulate such sources to the extent EPA determined necessary to protect water quality. EPA was directed to conduct two specific studies, in consultation with the States, to identify potential additional point source discharges of pollutants to be addressed, and to determine appropriate means of controlling those additional sources as necessary to protect water quality. EPA was to report the results of these studies to Congress and then, in consultation with the States, issue regulations to establish a comprehensive program to control additional stormwater discharges as necessary to protect water quality.

In a separate section of these 1987 Amendments, Congress

included a limitation on permit requirements for certain oil, gas and mining operations. Section 402(l)(2) expressly prohibited EPA from requiring a permit for stormwater discharges from oil and gas activities, unless the discharges were contaminated by contact with materials located on the site of such operations. The exemption reads as follows:

> The Administrator shall not require a permit under this section, nor shall the Administrator directly or indirectly require any State to require a permit, for discharges of stormwater runoff from mining operations or oil and gas exploration, production, processing, or treatment operations or transmission facilities, composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) which are not contaminated by contact with, or do not come into contact with, any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations.

The reasoning behind this exception, as found in the legislative history, was to allow "important oil, gas, and mining operations [to] continue without unnecessary paperwork restrictions, while protection of the environment remains at a premium". See 132 Cong. Rec. 31, 964 (1986); 133 Cong. Rec. H171 (daily ed. Jan. 8, 1987).

On December 8, 1999, after identifying additional sources of storm water discharges that needed to be regulated to protect water quality, EPA issued the Phase II storm water rule (Phase II Rule). The Phase II Rule extends the NPDES permit program to additional dischargers, including operators of construction sites

that disturb one to five acres of land ("small construction sites"). In order to comply with these 1999 rules, operators of such sites were required to have permits by March 10, 2003.

According to EPA, at the time that it promulgated the Phase II Rule, it "assumed that few, if any, oil and gas exploration, production, processing, or treatment operations or transmission facilities would be affected by the rule". 40 C.F.R. Part 122; 68 Fed. Reg. 11325 (March 10, 2003). Soon afterwards, however, EPA received information that as many as 30,000 oil and gas sites per year could be affected by the storm water regulations.

As a result of this discovery EPA promulgated, on March 10, 2003, a final rule requiring "small oil and gas construction activities" to obtain a permit for stormwater discharges by March 10, 2005 ("Deferral Rule"). The stated purpose of this deferral was to

> allow time for EPA to analyze and better evaluate: the impact of the permit requirements on the oil and gas industry; the appropriate best management practices for preventing contamination of storm water runoff resulting from construction associated with oil and gas exploration, production, processing, or treatment operations or transmission facilities, and the scope and effect of 33 U.S.C. 1342 (l)(2) and other storm water provisions of the Clean Water Act.

Seven trade associations (Appellants-Petitioners), whose purpose is to promote the interests of the oil and gas industry, filed three petitions for review of the Deferral Rule. The Oklahoma Independent Petroleum Association, another oil and gas

industry association, intervened in the cases. The three petitions were consolidated by the Court.

On March 9, 2005, EPA published a final rule amending the Deferral Rule by postponing the requirement for obtaining permit coverage for discharges associated with oil and gas construction activity that disturbs one to five acres of land from March 10, 2005 to June 12, 2006. Along with this rule, EPA published a statement that "[w]ithin six months of [this] action, EPA intends to publish a notice of proposed rulemaking in the Federal Register for addressing these discharges and to invite public comments".

## II.

EPA urges this Court to dismiss the petition for review as unripe because it has never issued a final rule with respect to the oil and gas exemption and, further, the Deferral Rule contemplates an additional evaluation and assessment of Section 402(l)(2) during the Deferral Period. According to EPA, this Court's consideration of Petitioner's attack on EPA's interpretation of § 402(l)(2) amounts to an improper interference with the agency's administrative actions.

In analyzing whether or not this case is ripe for review we start with the awareness that, in some cases, pre-enforcement review is acceptable. If there is certainty that the law will be

enforced, then it is irrelevant that the law has yet to be enforced, unless the Government demonstrates that the statute itself specifically demonstrates that Congress has prohibited pre-enforcement review. See Abbott Labs v. Gardner, 387 U.S. 136, 141 (1998). That being said, pre-enforcement review is still subject to the constraints of the ripeness test. In the cases in which pre-enforcement review of an administrative regulation has been permitted, the Courts have done so only after finding that the "regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance". Id. at 153. See also Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 171 (1967)(Finding that the regulations are "self-executing and have an immediate and substantial impact").

The Supreme Court has defined ripeness as

a justiciability doctrine designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties".

Nat'l Park Hospitality Ass'n v. Dept. of the Interior, 538 U.S. 803, 807 (2003), citing Abbott Labs, 387 U.S. at 148 – 49. In determining whether EPA's decision is "ripe" for review we must weigh both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

-6-

Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998). A court, in determining whether a case is ripe for review, must evaluate the following factors:

(1) whether delayed review would cause hardship to the plaintiffs;
(2) whether judicial intervention would inappropriately interfere with further administrative action; and
(3) whether the courts would benefit from further factual development of the issues presented.

Ohio Forestry Ass'n, 523 U.S. at 733. Stated differently, a case or controversy is ripe for judicial review when "an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Arch Mineral Corp. v. Babbitt, 104 F.3d 660, 665 (4th Cir. 1997).

Our application of the Ohio Forestry Ass'n test leads us to conclude that this case is not ripe for review. Starting with the second factor, it is clear to us that our ruling on this case would inappropriately interfere with administrative action. Given that EPA has specifically stated its intent to examine, during the Deferral Period, the issue of "how best to resolve questions posed by outside parties regarding section 402(l)(2) of the Clean Water Act", any interpretation we would provide would necessarily prematurely cut off EPA's interpretive process.

We are also unpersuaded that Petitioner has satisfied the first element of the ripeness test. Most particularly, we are unconvinced that the hardship faced by Petitioners at this time

is sufficient to override the administrative body's right to interpret the law. Given that the effective date of the permit requirement for Petitioners is now a year away, we are not convinced that Petitioners will suffer significant hardship if we decline to supersede the administrative process. Petitioners themselves, when discussing the nature of oil and gas exploration and production activities, explain that planning cannot be done far in advance, but rather that "the potential number and approximate location of the oil and gas wells is not known for a comparatively long time after drilling commences". Petitioners Brief, 53. Further, Petitioners state that "oil and gas activities do not have a long planning process, and instead proceed in a series of stops and starts dictated by the results of the last well and market conditions". Id. at 54. Given this uncertain nature of the oil and gas industry, Petitioners have not demonstrated how a possible change in permitting requirements a year from now could seriously affect an industry that, by its own admission, is unable to plan far in advance.

Finally, we do believe that this Court would benefit from further factual development of the issues presented. While we are aware that, in some cases, pre-enforcement review of an administrative rule is allowed, in this case we have no sense of what oil and gas construction activities would fall under EPA's permitting requirements. Without a factual context, such as an

-8-

attempt to require a permit for the construction of a road leading to a drilling site, a ruling of this Court would be little more than a direction to EPA to give effect to the oil and gas exemption. On the other hand, when EPA determines the specific types of construction related to oil and gas development upon which it will impose a permit requirement, Petitioners will be in a better position to demonstrate how the regulation violates the provisions of the statute. With this background, it is easy to see how this case is distinguishable from Abbott Laboratories. In that case the regulation unambiguously required drug companies to label all prescription drugs in a particular way. This regulation left no doubt of the immediate and severe consequences the drug companies would face in re-labeling all prescription drugs. By contrast, in our case it is uncertain whether EPA will require permits from Petitioners and there is no immediacy to the requirements as they do not go into effect for a year. EPA may promulgate a regulation which defines oil and gas operations to cover, for example, the building of roads at a drilling site or only drilling and oil and gas pipelines. Given the lack of specificity in the present rule, we would only be able to address the issue by attempting to hypothesize possible situations in which the rule might apply and determine what is or is not an oil and gas "operation". We conclude, therefore, that

this case is not ripe for review.[1] See RICHARD J. PIERCE, ADMINISTRATIVE LAW TREATISE § 15.4, at 1073 (4th ed. 2002)(discussing Abbott Laboratories and Toilet Goods Ass'n v. Gardner, 387 U.S. 158 (1967)).

## III.

For the reasons stated above, we conclude that this case is not ripe for review and, accordingly, we dismiss the petition.

---

[1]We recognize that this is the second time that EPA has deferred this rule and we can understand that Petitioners would be frustrated by their inability to obtain review. However, in the closely related area of the exhaustion of administrative remedies, courts have only excused petitioners from the requirement that they exhaust the administrative process in instances where the administrative agency's delay in ruling was particularly egregious. See Southwestern Bell Telephone Co. V. FCC, 138 F.3d 746 (8th Cir. 1998)(Court excused the petitioner from duty to allow an agency to consider a statutory interpretation argument where the agency had already taken nine years to resolve a dispute that was subject to a five-month statutory deadline.); Pavano v. Shalala, 95 F.3d 147 (2d Cir. 1996)(Court declined to exclude exhaustion requirement where it found that, while agency's delay was "unfortunate" it was "not a matter of administrative intransigence".) See also RICHARD J. PIERCE, ADMINISTRATIVE LAW TREATISE § 15.10, at 1032-34 (4th ed. 2002). Under the circumstances of this case, we are unable to say that EPA's action has been similarly unreasonable so as to allow us to intervene before the agency has the chance to complete its interpretation.