# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 03-3277, 03-3278, 03-3279, 03-3280 & 03-3281

TEXAS INDEPENDENT PRODUCERS
AND ROYALTY OWNERS ASSOCIATION, *et al.*,

*Petitioners,*

*v.*

ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

———————

Petitions for Review of an Order
of the Environmental Protection Agency.
No. 02-OW-55

———————

ARGUED DECEMBER 7, 2004—DECIDED JANUARY 27, 2006

———————

Before BAUER, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* In a previous opinion, *Texas Independent Producers and Royalty Owners Association v. EPA*, 410 F.3d 964, 977-78 (7th Cir. 2005), this court addressed various issues concerning a general permit issued by the Environmental Protection Agency ("EPA") for storm water discharges. We reserved several issues pending the resolution of litigation in another circuit. This opinion now addresses those unresolved issues relating to the "Final National Pollutant Discharge Elimination System General Permit for Storm Water Dis-

charges From Construction Activities" ("General Permit"), promulgated by the EPA on July 1, 2003. 68 Fed.Reg. 39,087 (July 1, 2003). To recap: Following the EPA's issuance of this General Permit, several organizations filed petitions for review, and those petitions were consolidated before this court. On June 13, 2005, this court held that the General Permit does not violate the Clean Water Act's ("CWA") requirements for public notice and public hearing. *Texas Indep. Producers and Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 977-78 (7th Cir. 2005). We also held that in issuing the General Permit, the EPA complied with the requirements of the Endangered Species Act. *Id.* at 979. However, we dismissed the petition filed by the Natural Resources Defense Council, Inc., for lack of standing. *Id.* at 976. We then stayed consideration of the remaining challenges presented by organizations representing individuals in the oil and gas industries, pending resolution by the Fifth Circuit as to whether those petitioners were required to obtain a permit in the first instance. *Id.* at 980. After the Fifth Circuit held that the Oil and Gas Petitioners' challenge to the application of the General Permit was not ripe for review, *Texas Independent Producers and Royalty Owners Assoc. v. EPA*, 413 F.3d 479, 484 (5th Cir. 2005), we directed the parties to file supplemental briefing addressing the import of that decision. Before briefing was due, Congress passed the Energy Policy Act of 2005, which expressly exempts construction activities in the oil and gas industries from the permit requirements of the CWA.[1] Energy Policy Act of 2005, Pub. L. No. 109-58, § 323, 119 Stat. 594, 694 (2005). We directed further briefing on the impact of the Energy Policy Act. We now hold that because of the exemption contained in the Energy Policy Act, those

---

[1] Following passage of the Energy Policy Act, the Oil and Gas Petitioners sought rehearing. On December 2, 2005, the Fifth Circuit denied the Petition for Rehearing, "WITHOUT PREJUDICE to seeking relief in the event of unreasonable delay by the Agency."

aspects of the General Permit that the Oil and Gas Petitioners seek to challenge do not apply to them. We therefore dismiss this petition for lack of standing.

## I.

Congress enacted the Clean Water Act ("CWA" or "Act") "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Among other things, the CWA prohibits the "discharge of any pollutant," except in compliance with the Act's provisions. 33 U.S.C. § 1311(a). In particular, the discharge of pollutants into navigable waters is illegal unless authorized by a permit issued pursuant to § 402 of the Act. 33 U.S.C. § 1342. Section 402 established the National Pollutant Discharge Elimination System ("NPDES"), and requires dischargers to obtain a permit from the EPA or an authorized state.[2] 33 U.S.C. § 1342(a)(1), (b).

In 1987, Congress added § 402(p) to the CWA, establishing a two-step phased approach to regulating storm water discharges. 33 U.S.C. § 1342(p). "In Phase I, Congress required NPDES permits for storm water discharges from 'industrial activities,' 33 U.S.C. § 1342(p)(3)(A), defined as construction activities involving five or more acres, as well as discharges from certain large municipal storm sewer systems. 55 Fed.Reg. 47,990, 48,066 (Nov. 16, 1990)." *Texas Indep. Producers*, 410 F.3d at 968. The EPA decided to implement the permit requirement for Phase I by using a general permit system, as opposed to a system requiring individual permits for each construction

---

[2] "The EPA administers the NPDES program in each state unless the EPA previously authorized a state program to issue NPDES permits." *Am. Paper Inst., Inc. v. EPA*, 890 F.2d 869, 871 (7th Cir. 1989) (citing 33 U.S.C. § 1342(b)).

activity. 55 Fed.Reg. 47,990, 48,005-06 (Nov. 16, 1990). *Texas Indep. Producers*, 410 F.3d at 968. As we explained in our prior opinion, "[t]he NPDES permitting system originally used individual permits, which was feasible for regulating discharges from wastewater facilities or industrial plants. However, by the 1980's it became clear that the individual permitting process was unworkable to regulate storm water discharges which can occur virtually anywhere." *Texas Indep. Producers*, 410 F.3d at 967-68 (citing 56 Fed.Reg. 40,948, 40,949-50 (Aug. 16, 1991)). "With a general permit, the EPA issues a permit for specific types of activities and establishes specific rules for complying with the permit. Then, rather than apply for an individual permit, operators must file a Notice of Intent stating that they plan to operate under the general permit, and absent a negative ruling by the EPA, discharges that comply with the terms of the general permit are automatically authorized." *Id.* at 968.

In 1992, the EPA issued its first general permit for construction-related storm water discharges. 57 Fed.Reg. 41176 (Sept. 9, 1992). The EPA, in 1997, proposed a revised general permit. 62 Fed.Reg. 29786 (June 2, 1997). *Texas Indep. Producers*, 410 F.3d at 968. Then in 1999, the EPA issued its Phase II storm water rules, which defined as additional discharges subject to the general permitting requirements "small construction sites (one to five acres), smaller municipalities, and additional sources that might be designated on a case-by-case basis. 64 Fed.Reg. 68722 (Dec. 8, 1999); 40 Fed.Reg. § 122.26(b)(15)." *Texas Indep. Producers*, 410 F.3d at 968. On December 20, 2002, the EPA proposed a third General Permit for storm water discharges from both large and small construction sites, 67 Fed.Reg. 78,116 (Dec. 20, 2002), although this General Permit only applies in jurisdictions not regulated by a State or Tribal NPDES permitting program. *Texas Indep. Producers*, 410 F.3d at 968. "After holding a series of public meetings and considering public comments, the EPA published notice of the final

General Permit on July 1, 2003. 68 Fed.Reg. 39,087." *Texas Indep. Producers*, 410 F.3d at 968.

Under the terms of the final General Permit, potential dischargers must submit a Notice of Intent to operate under the General Permit and a responsible corporate official must certify the basis for eligibility for such coverage under the General Permit. General Permit, Appendix G at 11A.1. We detailed many of the other terms of the General Permit in our prior opinion:

> The General Permit also requires that the operator create, maintain, and implement a site-specific Storm Water Pollution Prevention Plan ("SWPPP"), which must also be certified by a corporate official. General Permit 3.13; General Permit, Appendix G at 11A.1. The discharger must further implement best management practices ("BMP") necessary to comply with water quality standards, assure weekly site inspections, and document those inspections, including detailing weather conditions. See General Permit 4.5A (construction operators must "select, install, and maintain BMPs at your construction site" that minimize pollutants in the discharges as necessary to meet applicable water quality standards); General Permit 3.10.A (detailing requirements for inspections).

410 F.3d at 969.

After the EPA issued the General Permit, several organizations filed petitions for review of this final agency action, and those petitions were consolidated before this court. Of relevance here, the Oil and Gas Petitioners[3] presented several arguments. First, "the Oil and Gas Petitioners argue[d] that the EPA's definition of 'common plan' contained in the General Permit is so broad, ambiguous, and vague that it violates their

---

[3]   As noted above, this court resolved all the remaining petitions in our previous opinion. *Texas Indep. Producers*, 410 F.3d at 980.

rights to due process because they do not know if they need to apply for a General Permit." *Texas Indep. Producers*, 410 F.3d at 970. Similarly, "[t]he Oil and Gas Petitioners . . . argue[d] that the EPA's definition of 'final stabilization' is too vague." *Id.* Finally, "the Oil and Gas Petitioners argue[d] that the EPA's definitions of 'common plan' and 'final stabilization' are arbitrary and capricious because the definitions do not take into account the differences in construction activities related to oil and gas exploration and conventional residential and commercial activities." *Id.*

In presenting these arguments, the Oil and Gas Petitioners also asserted that the permit requirements of the CWA did not apply to them in the first instance. *Id.* However, the Oil and Gas Petitioners maintained that they were not challenging the EPA's decision that they must obtain storm water discharge permits, as that question was pending before the Fifth Circuit. *Id.* The Fifth Circuit case involved several final rules promulgated by the EPA, beginning with Final Rule, 68 Fed.Reg. 11,325. *See* 413 F.3d at 481. In 68 Fed.Reg. 11,325 ("Deferral Rule"), the EPA deferred the Phase II permit requirements it had established in 64 Fed.Reg. 68,722 for construction activities disturbing one to five acres, but only for construction activities at oil and gas sites. Specifically, the EPA stated that "[d]ischarges associated with small construction activity at such oil and gas sites require permit authorization by March 10, 2005."[4] 68 Fed.Reg. at 11,330.

Although the Deferral Rule extended the deadline for obtaining permits for construction activities at oil and gas sites, in doing so, the Deferral Rule also constituted the first time that the EPA maintained in a final agency action that such construction activities were subject to the permit requirements of the CWA. In response, in their petition filed in the Fifth Circuit, the Oil and Gas Petitioners argued that the EPA lacked

---

[4]    The EPA in 64 Fed.Reg. 68,722 originally required permits by March 10, 2003.

the authority to require permits for oil and gas construction activities based on § 402(l)(2) of the CWA. Section 402(l)(2) expressly prohibited the EPA from requiring a § 402 permit for storm water discharges for oil and gas activities unless the discharges were contaminated by contact with materials located on the site of such operations. 33 U.S.C. § 1342(l)(2).

After filing a petition for review of 68 Fed.Reg. 11,325, the EPA issued 70 Fed.Reg. 2832 (Jan. 18, 2005), which extended the deadline until March 10, 2005, and then in 70 Fed.Reg. 11,560 (March 9, 2005), the EPA extended the deadline again until June 12, 2006. On June 16, 2005, the Fifth Circuit issued its ruling, holding that the Oil and Gas Petitioners' challenge to the Deferral Rule was not ripe for review. 413 F.3d at 484. The Fifth Circuit reasoned: "Given that EPA has specifically stated its intent to examine, during the Deferral Period, the issue of 'how best to resolve questions posed by outside parties regarding section 402(l)(2) of the Clean Water Act,' any interpretation we would provide would necessarily prematurely cut off EPA's interpretive process." *Id.* at 483.

Following the Fifth Circuit's decision, this court directed the parties to file supplemental briefing on the issue of ripeness and the import of the Fifth Circuit's decision, later extending the briefing schedule, pursuant to the parties' request, until September 9, 2005. Before briefing was completed, Congress passed the Energy Policy Act of 2005, signed into law on August 8, 2005. Energy Policy Act of 2005, Pub. L. No. 109-58, § 323, 119 Stat. 594, 694 (2005). Among other things, the Energy Policy Act amended the CWA's definition of oil and gas exploration, providing:

Section 502 of the Federal Water Pollution Control Act (33 U.S.C. § 1362) is amended by adding at the end the following:

(24) OIL AND GAS EXPLORATION AND PRODUC-TION.—

The term "oil and gas exploration, production, processing or treatment operations or transmission facilities" means all field activities or operations associated with exploration, production, processing, or treatment operations, or transmission facilities, including activities necessary to prepare a site for drilling and for the movement and placement of drilling equipment, *whether or not such field activities or operations may be considered to be construction activities.*

Energy Policy Act of 2005, Pub. L. No. 109-58, § 323, 119 Stat. 594, 694 (2005) (emphasis added).

Based on the Energy Policy Act's amendment to the definition of oil and gas exploration, the Oil and Gas Petitioners filed with this court a "Motion to Dismiss Without Prejudice." In their motion, the Oil and Gas Petitioners argued that their petition was moot because revised Section 502(24) made clear that they cannot be required to obtain coverage under the General Permit for uncontaminated discharges from oil and gas construction sites. However, the "Oil and Gas Petitioners request[ed] that the dismissal be without prejudice because EPA has not yet taken a position as to the impact of the Energy Policy Act of 2005 on the permit requirement or this litigation, and the Oil and Gas Petitioners should be able to raise these claims if EPA were to interpret the Energy Policy Act of 2005 to . . . require permits for uncontaminated discharges from oil and gas sites. . . ."

Concerned about the propriety of a dismissal without prejudice, given that 33 U.S.C. § 1369(b)(1) requires petitions to be filed within 120 days of the Final Rule, we requested supplemental briefing. The EPA responded that based upon 33 U.S.C. § 1369(b)(1), the deadline for filing a petition challenging the General Permit passed in October 2004, and that a dismissal without prejudice was tantamount to a dismissal with prejudice because any future challenge by the Oil and Gas Petitioners would be untimely. Based on the EPA's

position that the Oil and Gas Petitioners could not challenge the terms of the General Permit at a later date, the Oil and Gas Petitioners requested this court to deny their Motion to Dismiss Without Prejudice, seeking instead resolution of their underlying petition. The EPA did not object to the Oil and Gas Petitioners' request that we deny its motion to dismiss. Accordingly, on October 6, 2005, this court denied the Oil and Gas Petitioners' motion to dismiss without prejudice, and directed the parties to complete the supplemental briefing previously ordered and stayed pending resolution on the motion to dismiss, and to also brief the newly raised issue of mootness. Having received and reviewed the parties' supplemental briefs, we now consider the Oil and Gas Petitioners' petition.

## II.

In their petition, the Oil and Gas Petitioners challenged various aspects of the General Permit as applied to uncontaminated discharges. The Oil and Gas Petitioners do not object to the General Permit to the extent that it applies only to contaminated discharges, as defined by the EPA. Rather, the Oil and Gas Petitioners claim that as to uncontaminated discharges, the General Permit's definitions of "common plan" and "final stabilization" are so broad, ambiguous, and vague that the General Permit violates their rights to due process because they do not know if they need to apply for a General Permit for uncontaminated discharges. The Oil and Gas Petitioners also argued that the EPA acted arbitrarily and capriciously in establishing the terms of the General Permit related to uncontaminated discharges, without accounting for the differences between construction activities at general construction sites and at oil and gas sites. However, before we can address the merits of the Oil and Gas Petitioners' challenge, we must first determine whether the parties have standing to sue. *Texas Indep. Producers*, 410 F.3d at 970-71.

The CWA authorizes any "interested person" to obtain review of an EPA action in a Circuit Court. 33 U.S.C. § 1369(b)(1)(F). To qualify as an "interested person," at a minimum, a party must have Article III standing. *Texas Indep. Producers,* 410 F.3d at 971 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)). Generally, this requires a petitioner to "demonstrate an injury in fact; a causal link between the injury and the challenged action; and redressability through a favorable court decision." *Texas Indep. Producers,* 410 F.3d at 971 (citing *Lujan,* 504 U.S. at 561). Moreover, because the Oil and Gas Petitioners are organizations, to demonstrate standing, they must show that they represent members who have standing in their own right. *See Texas Indep. Producers,* 410 F.3d at 971.

In their original brief before this court, the Oil and Gas Petitioners made only passing reference to standing, merely stating that they have standing because their members are regulated under the General Permit. However, the Oil and Gas Petitioners also asserted that they were not required to obtain a permit for uncontaminated discharges. If true, that would mean that the Oil and Gas Petitioners' members would not be injured by the terms of the General Permit that they seek to challenge. In its supplemental briefing, the EPA agrees that if the Oil and Gas Petitioners are not subject to the NPDES permit requirements for storm water discharges from construction activities, then their challenges to the General Permit are no longer justiciable. Thus, before we can consider the Oil and Gas Petitioners' challenges to the terms of the General Permit, we must initially determine whether the Oil and Gas Petitioners are subject to the General Permit for uncontaminated discharges.

The Oil and Gas Petitioners maintain in their supplemental briefing that, following passage of the Energy Policy Act of 2005, they are definitively not subject to the General Permit for

uncontaminated discharges.[5] We agree. As noted above, the CWA expressly provides that:

> The Administrator *shall not require a permit under this section*, nor shall the Administrator directly or indirectly require any State to require a permit, *for discharges of storm water runoff from mining operations or oil and gas exploration, production, processing, or treatment operations or transmission facilities*, composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and which are not contaminated by contact with, or do not come into contact with any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations.

33 U.S.C. § 1342(l)(2) (emphasis added).

After the EPA issued its Deferral Rule purporting to regulate construction activities at oil and gas sites, Congress responded by passing the Energy Policy Act of 2005, which expressly addressed the issue, providing:

> The term "oil and gas exploration, production, processing or treatment operations or transmission facilities" means all field activities or operations associated with exploration, production, processing, or treatment operations, or transmission facilities, including activities necessary to prepare a site for drilling and for the movement and placement of drilling equipment, *whether or not such field*

---

[5]   The Oil and Gas Petitioners maintain that even prior to the passage of the Energy Policy Act of 2005, Section 402(1)(2) exempts them from the permit requirements of the CWA, but add that the Energy Policy Act of 2005 now resolves the issue beyond dispute.

*activities or operations may be considered to be construction activities.*

Energy Policy Act of 2005, Pub. L. No. 109-58, § 323, 119 Stat. 594, 694 (2005) (emphasis added).

Given the broad definition of exempt activities for uncontaminated discharges and Congress's explicit clarification that the exemption applied even if those activities constitute construction activities, we conclude that the Oil and Gas Petitioners lack standing. Because the record establishes only that the Oil and Gas Petitioners represent members involved in oil and gas exploration and related activities and they challenge only uncontaminated discharges which are exempt from the permitting requirements, the Oil and Gas Petitioners cannot establish that the General Permit injured its members.

The EPA does not challenge the Oil and Gas Petitioners' analysis of the § 402(l)(2) exemption. In fact, notwithstanding this court's order directing the EPA to address whether the Energy Policy Act of 2005 exempts the Oil and Gas Petitioners from the permitting requirements of the CWA, the EPA failed to address that issue. That is especially troubling since the EPA correctly noted in its supplemental brief that "[a]n actual controversy must exist at all stages of the case, not merely at the time the case is filed." The EPA further recognized that this means that this "Court must determine whether some members of the Oil and Gas Petitioners are still injured by the terms of the General Permit following enactment of the Energy Policy Act of 2005 before resolving the merits of their petition." But then, rather than provide an analysis of the issue, much less take a position, the EPA instead stated that it "recognizes that the recently enacted Energy Policy Act of 2005 affects the NPDES permitting requirements applicable to oil and gas activities [and the] EPA intends to take into account

this new law in forthcoming rulemaking . . . ."[6]

On January 6, 2006, the EPA filed with this court as supplemental authority its proposed administrative action titled "Amendments to the National Pollutant Discharge Elimination System (NPDES) Regulations for Storm Water Discharges Associated with Oil and Gas Exploration, Production, Processing, or Treatment Operations, or Transmission Facilities." 71 Fed.Reg. 894 (Jan. 6, 2006). "This proposed regulation would implement Congress' intention, in the Energy Policy Act of 2005, to exclude virtually all[7] oil and gas construction activities from regulation under the NPDES storm water program." 71 Fed.Reg. at 897. This raises the issue of ripeness. In determining whether a case is ripe for review, this court considers whether: (1) delayed review of an agency decision could cause hardship to the petitioner; (2) judicial intervention would inappropriately interfere with further administrative action; and (3) the court would benefit from further factual development of the issues presented. *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). Applying these three factors, the Fifth Circuit concluded that the Oil and Gas Petitioners' challenge to the Deferral Rule was not ripe because the EPA

---

[6] In passing, the EPA also posits, without support, that since the Petitioners must obtain a permit for contaminated discharges, they have standing to challenge the terms of the General Permit. However, the Petitioners do not claim any injury flowing from the General Permit where contaminated discharges are involved. Rather, the Petitioners argue that the broad language of the General Permit, when applied to non-contaminated discharges, violates their due process rights and is arbitrary and capricious. To assess standing, then, we must ask whether the Petitioners are injured in the way they assert—not whether they would have standing to present a different claim.

[7] The only activities not exempt would be contaminated discharges. 71 Fed.Reg. at 897.

has specifically stated its intent to examine, during the Deferral Period, the issue of "how best to resolve questions posed by outside parties regarding section 402(l)(2) of the Clean Water Act . . . ." 413 F.3d at 483. Although the EPA had sought dismissal on ripeness grounds in the Fifth Circuit, in its supplemental briefing before this court, the EPA asserts that the Oil and Gas Petitioners' claim is ripe for review. We agree for several reasons.

First, as the EPA recognized, the Fifth Circuit's decision addressed only the EPA's rule deferring NPDES permitting deadlines for construction activities at small oil and gas sites. 413 F.3d at 481. Because those deadlines would not go into effect for a year, the Fifth Circuit reasoned that there is no immediacy for resolution, and thus no hardship to the petitioners. *Id.* at 484. In contrast, the permitting requirements for large construction activities are currently in force. 55 Fed.Reg. 47,990, 48,066 (Nov. 16, 1990) (adopting Phase I, and requiring NPDES permits for storm water discharges from construction activities involving five or more acres). *See Texas Indep. Producers*, 410 F.3d at 968. Moreover, the General Permit the Oil and Gas Petitioners seek to challenge applies to uncontaminated storm water discharges from both small and large construction activities. Thus, the immediacy lacking in the Fifth Circuit case is present here.

Second, withholding of judicial review of the Oil and Gas Petitioners' challenge presents a significant hardship to the Petitioners' members. The EPA itself acknowledges this hardship, explaining, "[w]ithholding court consideration of the Oil and Gas Petitioners' current challenge would likely preclude them from seeking judicial review of the General Permit in the future." This again contrasts with the Fifth Circuit decision in which no such hardship existed. Moreover, given the breadth of the statutory exemption, further factual development is unnecessary. Finally, while in some circumstances it would make sense to await final agency action, given

Congress's clear directive this is not such a case. The agency can no longer require permits for uncontaminated discharges from construction activities undertaken pursuant to oil and gas "field activities or operations associated with exploration, production, processing, or treatment operations, or transmission facilities."[8] Energy Policy Act of 2005, Pub. L. No. 109-58, § 323, 119 Stat. 594, 694 (2005). *Cf. Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) (striking a regulation promulgated by the Corps because it exceeded the statutory authority granted it by Congress in the CWA). Therefore, given the limited circumstances before us, and because a refusal to consider their petition would cause substantial hardship to the petitioners, this case is ripe for review. However, as discussed above, our review discloses that the terms of the General Permit which the Oil and Gas Petitioners challenge do not apply to them. Therefore, because those terms do not injure any of their members, they lack standing.

### III.

The Oil and Gas Petitioners sought review of the General Permit as applied to uncontaminated discharges. However, since filing their petition, Congress made clear that oil and gas construction activities undertaken pursuant to "field activities or operations associated with exploration, production, processing, or treatment operations, or transmission facilities," are exempt from the permitting requirements for uncontaminated discharges. The Oil and Gas Petitioners represent members seeking to challenge the permit requirements for uncontaminated discharges. But Congress made clear in the Energy Policy Act of 2005 that the EPA may not require permits for such discharges. Therefore, the Oil and Gas Petitioners cannot

---

[8]   The proposed administrative action recognizes as much. 71 Fed.Reg. 894 (Jan. 6, 2006).

establish standing. Accordingly, we DISMISS this petition for lack of standing.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*