Rivera, J.
(dissenting in part). Petitioners are eight organizations or corporations, including lead petitioner, the not-for-profit Natural Resources Defense Council, Inc., whose several members use and enjoy New York State water bodies. Petitioners challenge New York’s statewide general permit which al *398 lows storm water pollutant discharges from small municipal storm sewer systems. I concur with the majority to the extent it affirms dismissal of petitioners’ claims as related to the “no net increase” provision and monitoring. However, because I conclude that the State’s general permit as currently implemented fails to comply in several respects with federal and state statutory and regulatory mandates, I dissent.
L
A, Water Pollution Control and the Clean Water Act
Long-standing concerns over contamination of New York’s and the nation’s waters have led to over a century of governmental controls and prohibitions on water pollution. As far back as 1903, New York State prohibited sewage and waste discharge into public waters (see L 1903, ch 468). There was also early federal concern with contamination of New York’s water, as reflected by congressional passage of laws in 1886 and 1888 prohibiting discharges of certain pollutants and refuse into New York Harbor (see 49th Cong, ch 929, § 3, 24 US Stat 310, 329 [Aug. 5, 1886]).
The Rivers and Harbors Appropriation Act of 1899 was the first statute to consolidate these and other prior federal prevention efforts, in order to establish nationwide water pollution controls. The act prohibited discharge of “any refuse matter of any kind or description whatsoever,” into any navigable water of the United States without approval or a permit from the United States Army Corps of Engineers (see William L. Andreen, The Evolution of Water Pollution Control in the United States — State, Local, and Federal Efforts, 1789-1972: Part II, 22 Stan Envtl LJ 215, 220-221 [2003]; American Bar Association, Section of Natural Resources, Energy, and Environmental Law, The Clean Water Act Handbook at 1 [3d ed 2011]).
Water pollution, however, remained unabated and continued to present serious public health issues (see Andreen at 222; Philip H. Dixon, Environmental Law and Regulation in New York § 6:2 [2d ed 9 West’s NY Prac Series]). Congress eventually passed the Federal Water Pollution Control Act in 1948 (FWPCA) to address stream pollution which, as a result of World War II, had intensified due to “increased industrial activity and dramatically lower expenditures on wastewater treatment” (Andreen at 235). Under the FWPCA, the states bore primary responsibility for water pollution within their jurisdictions, and federal enforcement was limited (see Andreen at 237-238; see also 80th Cong, ch 758, 62 US Stat 1155 [June 30, *399 1948]). Over time, Congress amended the FWPCA to provide financial assistance to municipalities in the form of grants to construct sewage treatment plants and to shore up federal enforcement (see Andreen at 240; 62 US Stat 1158).
As national concern increased over environmental degradation and the adverse impacts of water pollution on society and the economy, Congress established the Federal Water Pollution Control Administration (see Water Quality Act of 1965, Pub L 89-234, 79 US Stat 903), and the Environmental Protection Agency (EPA) (see 42 USC § 4321 [Reorganization Plan No. 3 of 1970 establishing the EPA]). It also enacted the Water Quality Act of 1965 and the Water Quality Improvement Act of 1970. This administrative and regulatory framework was intended to ensure the adoption and enforcement of appropriate water quality standards and pollution controls.
After these efforts failed to protect the nation’s waters from dangerous levels of contamination, or to halt the continued decline of water quality, Congress passed a comprehensive revision and recodification of the FWPCA in 1972 (see Pub L 92-500, 86 US Stat 816 [Oct. 18, 1972], codified as amended at 33 USC §§ 1251-1388). These amendments form the basis for what is best known as the Clean Water Act.
B. The Clean Water Act and the National Pollutant Discharge Elimination System
The Clean Water Act (CWA) heralded the modern era of federal water pollution control, with the stated objective to “restore and maintain the chemical, physical, and biological integrity of the Nation’s waters” and the goal of eliminating water pollution (see 33 USC § 1251 [a]). It provided for more robust federal enforcement of pollution controls and the development and implementation of waste treatment programs (see Andreen at 283-284). It also declared unlawful “the discharge of any pollutant by any person,” to “navigable waters” from a “point source” (see 33 USC § 1311 [a]) unless authorized by federal permit, in accordance with the newly established national pollutant discharge elimination system (NPDES) (see 33 USC § 1342 [a]).[1]
This federal permit scheme, central to the CWA and administered by the EPA, subjects permit holders to pollutant dis *400 charge limitations as well as mandatory monitoring and reporting requirements (see 33 USC §§ 1311 [b] [1] [A]; 1342 [b] [1] [A] [requiring SPDES permits to comply with section 1311]; see also Andreen at 261; Jeffrey M. Gaba, Generally Illegal: NPDES General Permits under the Clean Water Act, 31 Harv Envtl L Rev 409, 410 [2007]). While the NPDES permit “authoriz[es] some water pollution, [it] placets] important restrictions on the quality and character of that licit pollution” (Waterkeeper Alliance, Inc. v United States Envtl. Protection Agency, 399 F3d 486, 491 [2d Cir 2005]).
The CWA imposes effluent limitations, which are “restriction [s] ... on [the] quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters” (id., citing South Fla. Water Management Dist. v Miccosukee Tribe, 541 US 95, 102 [2004]). The CWA defines effluent limitations as “any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance” (33 USC § 1362 [11]). Certain effluent limitations are technology-based, meaning they are “established in accordance with various technological standards that the [CWA] statutorily provides and that . . . vary depending upon the type of pollutant involved, the type of discharge involved, and whether the point source in question is new or already existing” (Waterkeeper, 399 F3d at 491). The CWA also provides for more stringent water quality-based effluent limitations when necessary to ensure state water quality standards (see 33 USC § 1311 [b] [1] [C]). The technology-based and water quality-based limitations are generally represented as numerical limits on specific pollutant discharges (see Waterkeeper, 399 F3d at 491).
A permit is issued “upon condition that such [pollutant] discharge will meet... all applicable requirements including the effluent limitations statutorily required” by the CWA (id. at 498 [brackets omitted]). Thus, under the CWA’s NPDES permit structure, “a discharger’s performance is now measured against strict technology-based effluent limitations — specified levels of treatment — to which it must conform, rather than against lim *401 itations derived from water quality standards to which it and other polluters must collectively conform” (EPA v California ex rel. State Water Resources Control Bd., 426 US 200, 204-205 [1976]). As described by the United States Supreme Court
“[a]n NPDES permit serves to transform generally applicable effluent limitations and other standards — including those based on water quality— into the obligations (including a timetable for compliance) of the individual discharger, and the Amendments provide for direct administrative and judicial enforcement of permits ... In short, the permit defines, and facilitates compliance with, and enforcement of, a preponderance of a discharger’s obligations under the [Clean Water Act] Amendments” (id. at 205).
The CWA itself “imposes only limited procedural obligations on the issuance of NPDES permits” (Gaba at 417). The process for obtaining a permit is specifically set forth in EPA regulations (see 40 CFR 122.21 et seq.). As a general matter, an applicant must file an EPA permit application form (see 40 CFR 122.21 [a] [2]). The application must be submitted at least 180 days before the applicant intends to commence discharging (see 40 CFR 122.21 [c] [1]), and no permit will issue if an application is deemed incomplete by the EPA (see 40 CFR 122.21 [e] [1]).
The CWA anticipates and requires certain opportunities for public participation. As prominently set forth in the CWA declaration of goals and policy, “[p]ublic participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the [EPA] or any State . . . shall be provided for, encouraged, and assisted by the [EPA] and the States” (33 USC § 1251 [e]). The EPA may issue a NPDES permit only “after opportunity for public hearing” (33 USC § 1342 [a] [1]), and “[a] copy of each permit application and each permit issued . . . shall be available to the public” (33 USC § 1342 [j]). In addition, the EPA regulations provide for public participation in the issuance of NPDES permits, including requiring notice and opportunity for comment on the denial of permit applications or the issuance of draft permits (see 40 CFR 124.10 [a] [1] [i], [ii]), and the opportunity for a public hearing at the request of interested parties (see 40 CFR 124.11). The Administrator of the EPA shall hold a hearing where the Administrator “finds, on the basis of *402 requests, a significant degree of public interest in a draft permit(s)” (40 CFR 124.12 [a] [1]), or “at [the Administrator’s] discretion, whenever, for instance, such a hearing might clarify one or more issues involved in the permit decision” (40 CFR 124.12 [a] [2]).
Maximization of public involvement as a federally recognized goal is illustrated not only by the CWA’s public participation requirement, but also by its statutory provisions authorizing private civil suits (see 33 USC § 1365). Under the CWA, a person may commence a civil suit against individual polluters as well as federal and state government entities for failure to act in accordance with the law (see 33 USC § 1365 [a] [1], [2]). Private actors have actively litigated the proper enforcement of the CWA and compliance with NPDES permits (see e.g. Los Angeles County Flood Control Dist. v Natural Resources Defense Council, Inc., 568 US —, 133 S Ct 710 [2013] [environmental organizations brought action against California municipal entities, alleging that they were discharging urban stormwater runoff into navigable waters in violation of the CWA]; Decker v Northwest Environmental Defense Center, 568 US —, 133 S Ct 1326 [2013] [environmental organization brought action against Oregon officials and timber companies, alleging that they violated the CWA by discharging stormwater from ditches alongside logging roads in state forest without NPDES permits]).
C. State Pollutant Discharge Elimination System
The CWA also allows for a federally-authorized, EPA-approved state to issue permits “for discharges into navigable waters within” the state’s jurisdiction (33 USC § 1342 [b]). Currently, a majority of states are EPA-approved to operate their own state pollutant discharge elimination system (SPDES). The laws of such state must “provide adequate authority to carry out the [permit] program” (33 USC § 1342 [b]), and the permits issued pursuant to this EPA authorization, must “apply, and insure compliance with, any applicable [CWA effluent limitations and standards]” (33 USC § 1342 [b] [1] [A]).
In 1975, the EPA authorized New York to issue permits under the State’s SPDES, established pursuant to article 17 of the Environmental Conservation Law. Thus, discharges or pollutants from point sources into the waters of the state are prohibited, unless authorized under New York’s SPDES permit program (see ECL 17-0803; see also 33 USC § 1311 [a]). In ac *403 cordance with the ECL, any discharges allowed by these permits shall
“conform to and meet all applicable requirements of the [CWA] . . . and rules, regulations, guidelines, criteria, standards and limitations adopted pursuant thereto relating to effluent limitations, water quality related effluent limitations, new source performance standards, toxic and pretreatment effluent limitations, ocean discharge criteria, and monitoring, and to participate in the [NPDES] created by the [CWA]” (ECL 17-0801).
In addition to applicable federal requirements, such permits are also subject to regulations issued by the New York State Department of Environmental Conservation (DEC) (see 6 NYCRR part 750).
In New York, in order to obtain a permit, an interested party must file an application (see ECL 17-0803; 6 NYCRR 750-1.4 [a]). The applicant must secure the permit prior to actual discharge of any prohibited pollutant (ECL 17-0803 [“it shall be unlawful to discharge . . . without a SPDES permit”]; 6 NYCRR 750-1.4 [a] [“no person shall discharge . . . without a SPDES permit”]). As required by law, DEC reviews and, where appropriate, approves the permit and issues a draft permit setting forth the effluent limitations and other conditions applicable to the discharger (ECL 17-0809 [1]; 6 NYCRR 750-1.10 [a]).
Public participation under New York’s SPDES permit program is advanced through public notice requirements and an opportunity for public hearing on the permit application (see ECL 17-0805 [1] [b]; see also 6 NYCRR 750-1.12 [a] [requiring notice]). The DEC must provide notice of every draft SP-DES permit, describing its terms and conditions, and must allow for a minimum 30-day public comment period (ECL 17-0805 [1] [b]). During the comment period, “[t]he department may, in its discretion, provide an opportunity for the applicant or any interested agency, person or group of persons to request or petition for a public hearing” (id.).
D. General Permits
As an alternative to the NPDES permit established by the CWA, the EPA passed regulations allowing the issuance of general permits “to cover one or more categories or subcategories of discharges . . . within a geographical area” (40 CFR 122.28 *404 [a] [1]). A general permit “is a single NPDES permit that covers a number of individual discharges that would otherwise require individual NPDES permits” (Ohio Val. Envtl. Coalition v Horinko, 279 F Supp 2d 732, 758 [SD W Va 2003], citing 40 CFR 122.28; see also Environmental Defense Ctr., Inc. v United States Envtl. Protection Agency, 344 F3d 832, 853 [9th Cir 2003] [“A general permit is a tool by which EPA regulates a large number of similar dischargers”] [hereinafter EDC]). Unlike the single-applicant NPDES permit process, under the general permit scheme, the permitting authority may issue a general permit “containing a common set of effluent limitations and other permit conditions that will apply to a potentially large number of point sources” (Gaba at 419). As such, it provides for certain efficiencies and reduces the administrative burdens associated with an individual permit process (see Natural Resources Defense Council, Inc. v Costle, 568 F2d 1369, 1381 [DC Cir 1977] [“Area-wide regulation is one well-established means of coping with administrative exigency”]).
With the exception of the CWA’s authorization for general permits allowing discharges of “dredged or fill material” (see 33 USC § 1344 [e] [1]), the CWA contains no special provisions for a category of “general permits,” thus leaving the procedures and substantive contours of a general permit scheme to the EPA (see 40 CFR 122.28 [b]).[2] Those EPA regulations allow states to issue general permits through their SPDES programs, in accordance with federal regulatory provisions (see 40 CFR 123.1 [c] [“The (EPA) Administrator will approve State programs which conform to the applicable requirements of this part”]). All general permits, whether issued by the EPA or by an authorized state, must comply with the CWA and federal regulations (see 40 CFR 123.25 [a]).
Since under a general permit program the permit is not issued for individual dischargers, but rather sets forth requirements that all applicants must satisfy in order to lawfully discharge pollutants, public participation under this scheme is provided through a notice and comment period directed at *405 soliciting public comments on the contents of the general permit (see 40 CFR 124.10 [requiring notice]; 124.11 [allowing comment and requests for a hearing]). Once the general permit is finalized and approved, applicants for whom the general permit is designed may submit a notice of intent (NOI) to comply with the permit and thus acquire coverage thereunder (see 40 CFR 122.28 [b] [2] [i]).
New York State implements a general permit program (see 6 NYCRR 750-1.21 [a]). As defined in the ECL, a general permit
“cover [s] a category of point sources of one or more discharges within a stated geographical area which (i) involve the same or substantially similar types of operations, (ii) discharge the same types of pollutants, (iii) require the same effluent limitations or operating conditions, (iv) require the same or similar monitoring, and (v) which will result in minimal adverse cumulative impacts” (ECL 70-0117 [6] [a]; see also 6 NYCRR 750-1.21).
IL
A. Stormwater Pollutant Discharges
Congress amended the CWA in 1987 to provide for regulation of municipal and industrial stormwater discharges under the NPDES program (see 33 USC § 1342 [p]). Stormwater, from rain and snow, is a highly significant source of water pollution, because it flows across all types of surfaces and washes various contaminants into municipal storm sewer systems which then drain into local water bodies. According to the EPA,
“[s]torm water runoff continues to harm the nation’s waters. Runoff from lands modified by human activities can harm surface water resources in several ways[,] including by changing natural hydro-logic patterns and by elevating pollutant concentrations and loadings. Storm water runoff may contain or mobilize high levels of contaminants, such as sediment, suspended solids, nutrients, heavy metals, pathogens, toxins, oxygen-demanding substances, and floatables” (40 CFR 122.30 [c]).
Regulation of stormwater discharges are particularly challenging because of the ever present rain and snow that lead to stormwater runoff, and the fact that third parties may be the *406 source of illicit discharges to storm sewer systems {see 64 Fed Reg 68789 [“EPA acknowledges the need to devise a regulatory program that is both flexible enough to accommodate the episodic nature, variability and volume of wet weather discharges and prescriptive enough to ensure protection of the water resource”]).
As provided under the CWA, the NPDES permit for municipal storm sewer discharges “shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions the [EPA] Administrator or the State determines appropriate for the control of such pollutants” {see 33 USC § 1342 [p] [3] [B] [iii]). The CWA does not define the maximum extent practicable standard. However, it appears to provide broad authority to agencies to control stormwater pollution.
In 1990 and 1999, the EPA adopted rules regulating municipal separate storm sewer systems (MS4s), which are systems designed to carry stormwater {see 40 CFR 122.26 [b] [8]). The problems associated with regulating small MS4s are complex because of these municipalities’ limited resources, the sheer numbers and diversity of the localities impacted by the general permit system, and the opportunity for an MS4 drainage system to cross geographic boundary lines, thus implicating multiple government entities.
The federal regulations authorize state agencies to issue general permits for such discharges {see 40 CFR 122.26 [a] [5]; 122.28 [a] [2] [i]). According to the EPA regulations, the state general permit must require that the MS4 “develop, implement and enforce a storm water management program designed to reduce the discharge of pollutants from [the] MS4 to the maximum extent practicable (MEP), to protect water quality, and to satisfy the appropriate water quality requirements of the [CWA]” {see 40 CFR 122.34 [a]). Further, the MS4’s storm-water management program (SWMP) “must include the minimum control measures” set forth in the EPA regulations {id.). The EPA has also concluded that with respect to MS4s
“narrative effluent limitations requiring implementation of best management practices (BMPs) are generally the most appropriate form of effluent limitations when designed to satisfy technology requirements (including reductions of pollutants to *407 the maximum extent practicable) and to protect water quality. Implementation of best management practices consistent with the provisions of the storm water management program required pursuant to this section and the provisions of the permit required pursuant to § 122.33 constitutes compliance with the standard of reducing pollutants to the ‘maximum extent practicable’ ” (40 CFR 122.34 [a]).
B. New York State’s MS4 SPDES Stormwater Discharges General Permit
In 2003, DEC issued a General Permit for Stormwater Discharges for MS4s (General Permit), which applies to small municipalities as defined in the federal regulations (see 40 CFR 122.26 [b] [16]). The General Permit was renewed for two years in 2008, and renewed again for five years in 2010.[3] This single General Permit currently covers 559 municipal separate storm sewer systems, statewide.
The General Permit authorizes stormwater discharges by small MS4 operators covered by the permit. Coverage is effective once the MS4 submits, and the State accepts as complete, an NOI (see New York State Department of Environmental Conservation, SPDES General Permit for Stormwater Discharges from Municipal Separate Storm Sewer Systems [MS4s], Permit No. GP-0-10-002 at 2, available at http:// www.dec.ny.gov/docs/water_pdf/ms4gp2011.pdf, cached at http://www.nycourts.gov/reporter/webdocs/ms4gp2011.pdf [hereinafter General Permit] [“(A)uthorization under this SP-DES general permit is effective upon written notification from the (DEC) of the receipt of a complete NOI” (emphasis omitted)]). The New York NOI is a form document filled out by an MS4. It contains the MS4’s affirmances that it will comply with the general permit requirements, and that it has developed an initial SWMP to be implemented in accordance with the terms of the General Permit.
Under the General Permit scheme, an MS4
“must develop (for newly authorized MS4s, implement), and enforce a SWMP designed to reduce the discharge of pollutants from small MS4s to the *408 maximum extent practicable (‘MEP’) in order to protect water quality and to satisfy the appropriate water quality requirements of the ECL and the CWA. The objective of the permit is for the MS4s to assure achievement of the applicable water quality standards” (General Permit at 14 [Part IV. Storm-water Management Program (SWMP) Requirements, A. SWMP Background] [emphasis omitted]).
The General Permit requires the SWMP to contain the six mandatory minimum control measures set forth in the General Permit, and which mirror those contained in the EPA regulations. These control measures are titled: (1) public education and outreach on stormwater impacts; (2) public participation in the development, implementation and review of the MS4’s SWMP; (3) development of a program for detecting and eliminating “illicit discharges”; (4) development of a program to control construction site stormwater runoff; (5) post-construction stormwater management; and (6) pollution prevention for municipal operations (General Permit at 49-67 [Part VIII. Minimum Control Measures — Traditional Non-Land Use and Non-Traditional MS4s]; see also 40 CFR 122.34 [b] [1]-[6]).
Also, DEC has identified for each minimum control certain mandatory “best management practices” to be utilized by the MS4 “to prevent or reduce the pollution of waters of the state” (General Permit at 88 [Part X. Acronyms and Definitions]). The MS4’s SWMP must specifically set forth “measurable goals” for each management practice (see id. at 95). An MS4 documents the developed, planned, and implemented SWMP elements in a SWMP Plan (Plan),[4] which “describe[s] how pollutants in stormwater runoff will be controlled” (id. at 96).
In addition to the minimum controls and management practices identified by the DEC, an MS4 “must comply with all applicable technology-based effluent standards or limitations promulgated by EPA pursuant to” the CWA (General Permit at 22 [Part VI. Standard Permit Conditions, E. Technology Standards]). Further, “[i]f an effluent standard or limitation more stringent than any effluent limitation in the SPDES general permit or controlling a pollutant not limited in the permit is promulgated or approved after the permit is issued, the SWMP *409 plan shall be promptly modified to include that effluent standard or limitation” (id. at 22-23 [emphasis omitted]).
The ECL further requires that SPDES permits “insure compliance with water quality standards adopted pursuant to state law” (ECL 17-0811 [5]). The EPA regulations also prohibit issuance of SPDES permits that do not “ensure compliance with the applicable water quality requirements of all affected States” (see 40 CFR 122.4 [d]; 123.25 [a] [1], [15]; 122.44 [a] [1]).
The CWA requires a state to establish, as effluent limitations, water quality standards for the state’s water bodies by designating uses for every waterway and the amount of permissible pollutants that may be present without impairing those designated uses (see 33 USC § 1313 [c] [2] [A]). Where current technology-based pollution controls are ineffective to attain or retain water quality standards for a water body, then that body is considered “impaired” (see 33 USC § 1313 [d]). The CWA requires that the states priority rank these impaired waters, “taking into account the severity of the pollution and the uses to be made of such waters” (see 33 USC § 1313 [d] [1] [A]), and calculate for each the total maximum daily load (TMDL) for the relevant pollutants that the water body may receive from all sources while still maintaining its water quality standards for any particular pollutant (33 USC § 1313 [d] [1] [C]). The states must set reductions for sources responsible for discharging pollutants in order for the dischargers to meet the TMDL (see 33 USC § 1313 [d] [1] [C]). As petitioners and the State recognize, it can take years to determine a TMDL.
For those impaired waters in New York that do not have a TMDL, the State’s General Permit has established interim measures to address stormwater discharges pending designation of the applicable TMDL. In particular, effective the date the MS4 attains permit coverage, the MS4 must ensure “no net increase” in its discharge for certain pollutants, referred to as “pollutants of concern” and which are identified in the General Permit (see General Permit at 11, 101-108 [Part III. Special Conditions, B. Impaired Waters]). The General Permit includes pollutant load reductions for various water bodies in the state (General Permit at 78 [Part IX. Watershed Improvement Strategy Requirements, C. Pathogen Impaired Watershed MS4s]). Further, the MS4 must take all necessary actions to ensure future discharges do not cause or contribute to any existing violation of water quality standards. In other words, the Gen *410 eral Permit requires the MS4 maintain the pollutant level at status quo. With respect to those water bodies for which New York has established a TMDL, the General Permit requires that the MS4 comply with the discharge reduction as “defined by the TMDL program” (General Permit at 12 [Part III. Special Conditions, B. Impaired Waters, 2. Watershed Improvement Strategies]).
The MS4’s affirmative agreement to comply with the General Permit requirements is represented in the NOI form, which consists mainly of a simplified checklist of the minimum control measures and management practices. In other words, the MS4 selects from a “menu” of required and optional management practices, and thus indicates which items the MS4 will employ to meet a given minimum control measure.[5] In order to select from the list, the MS4 need only fill in the circle corresponding to each management practice. The NOI form also provides for a narrative description of “measurable goals,” with start and end dates “that will be used for each best management practice for each of the minimum control measures” (NOI at 12-13, 15).
*411 m.
Petitioners filed this hybrid CPLR article 78 proceeding and declaratory judgment action challenging portions of the General Permit as inconsistent with federal and state law. Petitioners requested the court remand the General Permit to DEC, with instructions that DEC modify the permit to conform with all applicable legal requirements.
Our scope of review requires that we determine whether DEC’s issuance of the General Permit “was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion” to the extent that the permit’s requirements violate state and federal law (CPLR 7803 [3]). Contrary to the majority, I conclude that DEC is in violation of applicable mandatory statutory and regulatory requirements on two grounds. First, DEC improperly grants coverage under the General Permit to an MS4 without a pre-coverage substantive review of the MS4’s intended storm-water discharge control measures. Second, the State’s General Permit scheme fails to provide members of the public with an opportunity to request a hearing on the contents of a MS4’s NOI and SWMP.
A. New York’s Small MS4 General Permit
Petitioners allege that the General Permit relies on an impermissible self-regulatory system, one that is dependent on the MS4 implementing pollution controls unverified by DEC for compliance with federal and state requirements. Specifically, petitioners claim that under federal law, the General Permit must contain effluent limitations that reduce pollutant discharges to the “maximum extent practicable,” and also ensure compliance with water quality standards. Petitioners explain that New York’s General Permit scheme fails to ensure the adoption of legally sufficient pollution controls because DEC authorizes an MS4 to develop and implement a stormwater discharge management program, without DEC first making an administrative determination that the specific measures chosen by the MS4 will satisfy statutory pollutant reduction standards.
DEC responds that by requiring an MS4 to adopt the six minimum control measures and certain best management practices, DEC has set the bench mark for compliance with the CWA’s “maximum extent practicable” standard. According to *412 DEC, so long as the MS4 agrees to the minimum control measures and management practices, the MS4 has chosen a course of action that meets legal requirements.
The majority concludes that the General Permit is in compliance with the CWA and ECL, and that the petitioners merely seek for this Court to hold the SPDES General Permit to the same standards applicable to a SPDES individual permit, in contravention of the state legislature’s intent (see majority op at 396-397). Essentially, the majority adopts DEC’s position that the stormwater general permit scheme is lawful because it complies with EPA stormwater regulations and ECL requirements, and reflects the legislative preference for a streamlined regulatory process which reduces or eliminates administrative burdens (see id. at 395-396).
I agree with the majority that the General Permit is designed to reduce the administrative burdens associated with the SP-DES individual permit program, and that our analysis of petitioners’ claims must consider that these are different permitting schemes. Where I disagree with the majority is with its conclusion that the State’s stormwater General Permit complies with the CWA and ECL when it does no more than allow those who seek to discharge pollutants to determine for themselves the pollution controls that satisfy the federal standard, and as a consequence insulate themselves from liability should they fall short of the federal mandate to reduce discharges to the “maximum extent practicable.”
DEC’s own description of the General Permit and its regulatory efforts establishes that DEC has created an impermissible scheme that allows pollution without first ensuring that the MS4s’ pollution controls comply with the CWA and ECL. While the General Permit sets forth certain control measures and management practices that every MS4 must incorporate as part of its pollutant discharge control program, the MS4 is wholly responsible for the task of identifying, developing and implementing the activities and measurable goals necessary to achieve the reduction of stormwater discharges to the “maximum extent practicable.” This is not itself unlawful because DEC could reasonably conclude there are administrative and substantive benefits associated with allowing the state’s several hundred municipalities to develop pollution control programs designed to address local circumstances. However, by leaving to an MS4 the development and adoption of its pollutant discharge controls, and granting general permit coverage *413 without DEC having reviewed the MS4’s program to ensure compliance with the CWA and ECL, the State has abdicated its essential regulatory role, in violation of the CWA and ECL.[6]
The mechanics of the general permit scheme are undisputed. The General Permit replaces the individual permit system with a single permit applicable to a class of dischargers. New York’s General Permit contains the six minimum control measures identified by the EPA as appropriate to reducing pollutant discharges to the maximum extent practicable. DEC contends that it has determined that these measures can be achieved by application of certain best management practices and has included those in the General Permit, grouped according to their corresponding control measure. Thus, the measures, as expanded by the specified management practices, are the foundation of the DEC’s approach to ensuring an MS4’s reduction of stormwater pollutant discharges within the mandates of the CWA.
In directing an MS4 to employ these control measures and management practices in order to achieve compliance with the “maximum extent practicable” standard, the General Permit does little to explain the standard, other than to state that if an MS4 utilizes all the applicable management practices it will satisfy the federal standard. However, the text of the controls and management practices lacks the type of quantitative explication of objective standards which an MS4 can apply to assess whether its stormwater system’s protocols actually reduce pollutant discharges to a legally sufficient level.
For example, the minimum control measure titled “Illicit Discharge Detection and Elimination,” which refers to mixed stormwater discharges such as sanitary sewage, garage drain effluent, and waste motor oil, requires as a management practice that an MS4 “[d]evelop . . . , implement and enforce a program to detect and eliminate illicit discharges . . . into the small MS4” (see General Permit at 34-35 [Part VII. Minimum Control Measures — Traditional Land Use Control, A. Traditional Land-Use Control MS4 Minimum Control Measures *414 (MCMs), 3. Illicit Discharge Detection and Elimination (IDDE) — SWMP Development/Implementation] [emphasis omitted]). This, of course, says nothing more than that the MS4 must establish a program to comply with the law. This is but one example of the vague management practices that provide little by way of instruction on how an MS4 develops and implements specific controls to achieve sufficient reduction of discharge levels.
Each and every one of those six control measures requires that the MS4 “[d]evelop (for newly authorized MS4s), record, periodically assess, and modify as needed, measurable goals,” and also that the MS4 “[s] elect and implement appropriate . . . [activities or best management practices] and measurable goals to ensure the reduction of all [pollutants of concern] in stormwater discharges to the [maximum extent practicable]” (General Permit at 29, 33, 35, 39, 46 [Part VII. Minimum Control Measures — Traditional Land Use Control] [emphasis omitted]). As the General Permit requires, the SWMP “describe [s] the [best management practice]/measurable goal”; “identifies] time lines/schedules and milestones for development and implementation”; includes “quantifiable goals to assess progress over time”; and describes “how the covered entity will address [pollutants of concern]” (General Permit at 95 [Part X. Acronyms and Definitions]). These are hardly the type of “highly specific” controls DEC claims them to be.
While the General Permit references other guidance, the guidance is non-binding. Moreover, it is still the case that the MS4 could choose to ignore the guidance, believing it has complied with the maximum extent practicable standard only to learn later that it has violated the CWA. This is not a merely speculative assessment of the general permit structure because as the permit itself states
“[i]f a covered entity chooses only a few of the least expensive methods, it is likely that MEP has not been met. On the other hand, if a covered entity employs all applicable BMPs except those where it can be shown that they are not technically feasible in the locality, or whose cost would exceed any benefit to be derived, it would have met the standard. MEP required covered entities to choose effective BMPs, and to reject applicable BMPs only where other effective BMPs will serve the same purpose, *415 the BMPs would not be technically feasible, or the cost would be prohibitive” (General Permit at 91 [Part X. Acronyms and Definitions]).
As this suggests, something less than adoption of all of the management practices may comply with the maximum extent practicable standard, but when that would be the case and under what circumstances is uncertain and subject to the particularities of the MS4.
More significant than the opportunity for an MS4 to select additional management practices — or even substitute mandatory best management practices with management practices the MS4 determines on its own are better suited or economically feasible, and yet still designed to achieve reduction to the maximum extent practicable — is the fact that, even if the mandatory management practices were clearer and specific, the General Permit does not, alone, set the limitations that each MS4 will implement. Instead, DEC delegated that task to the MS4. The General Permit requires that in order to utilize the measures and management practices, the MS4 must determine the details and logistics of the management practices it has selected. Thus, the general permit scheme depends on each MS4’s determination and eventual adoption of the most efficacious practices that the MS4 will apply to achieve the statutory goal of pollutant discharge reductions to the maximum extent practicable.
To that end, the General Permit specifically requires that the MS4 develop and implement a SWMP “designed to reduce the discharge of pollutants from small MS4s to the maximum extent practicable ... in order to protect water quality and to satisfy the appropriate water quality requirements of the ECL and the CWA” (see General Permit at 14 [Part IV. Stormwater Management Program (SWMP) Requirements, A. SWMP Background]). Although the General Permit requires the SWMP to contain the six measures and the mandatory management practices, the SWMP does more than merely recite them. Rather, the SWMP expounds upon them, and thus reflects the MS4’s determination of the appropriate limits necessary to achieve CWA compliance.
That determination is set forth in the “measurable goals” the MS4 develops for each of the management practices. These goals are intended to “help the covered entities assess the *416 status and progress of their program” (General Permit at 95 [Part X. Acronyms and Definitions]). They “should reflect the needs and characteristics of the covered entity and the areas served by its small MS4. Furthermore, the goals should be chosen using an integrated approach that fully addresses the requirements and intent of the [minimum control measures]” {id. at 91).
This is not a static process, because as the General Permit indicates, “[t]he assumption is that the program schedules would be created over a 5 year period and goals would be integrated into that time frame” {id.). Particularly troubling is the fact that DEC does not review the SWMP or the Plan. In fact, it appears DEC has gone to great lengths to avoid formal consideration of both by prohibiting inclusion of the SWMP with the MS4’s NOI, and by allowing up to three years after the effective date of permit coverage for the MS4 to develop and implement the Plan.
If, as DEC argues, all that is required to result in discharge reductions sufficient to comply with the CWA is the employment of the minimum control measures and the mandatory management practices, there would be no need for municipal development and articulation of “activities,” “measurable goals” and “other techniques.” In reality, the MS4 is left to details where none have been provided, and to craft a SWMP and Plan to guide the implementation of its stormwater discharge reduction efforts. Notably, DEC anticipates that those efforts will change over time, and thus allows the Plan to be developed and implemented up to three years after the MS4 gains coverage under the General Permit.
The majority concludes that “[t]here is no doubt that the 2010 General Permit complies with EPA’s 1999 regulations” (majority op at 390). However, those very same federal regulations for small municipal separate storm sewer systems were deemed to violate the CWA in EDC because they failed to provide for meaningful administrative review {see 344 F3d 832, 856 [9th Cir 2003]). In that case, the Ninth Circuit Court of Appeals considered a challenge to the EPA’s stormwater Phase II rule, under which small MS4s were authorized by an NPDES general permit to immediately commence the discharge of stormwater after submitting an NOI. Unlike the “traditional general permitting model,” the court explained, “the Phase II Rule requires that each NOI contain information on an *417 individualized pollution control program that addresses each of the six general criteria specified in the Minimum Measures” {id. at 853). Under the rule, the EPA was not required to conduct a review of each NOI prior to discharge authorization, as it is required to conduct before granting an application for an individual permit {id. at 854-856). The Ninth Circuit held that the permitting scheme violated 33 USC § 1342 (p) (3) (B) (iii) because “nothing prevents the operator of a small MS4 from misunderstanding or misrepresenting its own stormwater situation and proposing a set of minimum measures for itself that would reduce the discharges by far less than the maximum extent practicable” {EDC, 344 F3d at 855). Moreover,
“in order to receive the protection of a general permit, the operator of a small MS4 needs to do nothing more than decide for itself what reduction in discharges would be the maximum practical reduction. No one will review that operator’s decision to make sure that it was reasonable, or even good faith” {id.).
As a consequence, the “EPA would allow permits to issue that would do less than require controls to reduce the discharge of pollutants to the maximum extent practicable” {id.). Accordingly, the court remanded that aspect of the rule.
The Second Circuit applied similar reasoning to reject EPA’s NPDES permitting scheme, albeit in a case involving different water pollutants, namely emissions from concentrated animal feeding operations (CAFOs) proscribed by the EPA’s CAFO rule. In Waterkeeper, the Circuit Court concluded that the CAFO rule did not require NPDES permitting authorities to review the management plans to ensure that the plans were developed and implemented so as to reduce discharges as required by the federal regulations {Waterkeeper, 399 F3d at 500).
New York’s General Permit similarly fails for the reasons articulated by the circuit courts in EDC and Waterkeeper. Although the Appellate Division concluded that the General Permit “include [s] a variety of enforcement measures that are sufficient to comply with the maximum extent practicable standard” (Matter of Natural Resources Defense Council, Inc. v New York State Dept. of Envtl. Conservation, 120 AD3d 1235, 1243 [2014]), that is beside the point because the issue is not the propriety of the measures or the management practices, *418 because those alone do not establish the details of any particular MS4’s stormwater discharge program. Indeed, petitioners do not challenge DEC’s choice of minimum controls or management practices. Rather, they challenge DEC’s failure to assess for legal adequacy the pollutant discharge proscriptions actually developed by the municipalities, and intended to be applied by the MS4s.
The fact that DEC provides a menu of management practices cannot save the general permit scheme because “nothing requires that the combination of items that the operator of a small MS4 selects from this ‘menu’ will have the combined effect of reducing discharges to the maximum extent practicable” (EDC, 344 F3d 832, 855 n 32). Moreover, it is not the amount of choices that matters here — as the DEC suggests by arguing that it imposes 44 mandatory management practices — because more practices are meaningless if there is no assessment as to whether the MS4 understands how those practices work and how to apply them to ensure pollutant discharge reduction to the level required by the CWA. This is certainly the case here where the CWA’s maximum extent practicable standard is intentionally undefined, and where DEC’s management practices are vague and generalized, often redundant of the minimum controls.
The majority appears to marginalize the decision in EDC, characterizing it as part of a federal circuit court split {see majority op at 394).[7] However, in EDC, the Ninth Circuit vacated the EPA regulations to the extent they did “allow permits to issue that would do less than require controls to reduce the discharge of pollutants to the maximum extent practicable” {EDC, 344 F3d at 855-856, citing 64 Fed Reg 68753). Rather than a division among the circuit courts, the Ninth Circuit decision is the only circuit decision on the validity of the regulations’ content. While the United States Supreme Court is the final word on the proper interpretation of the CWA and the EPA regulations, that Court has chosen not to take up the case (see Texas Cities Coalition on Stormwater v EPA, 541 US 1085 [2004] [denying petition for writ of certiorari]). Moreover, the Ninth Circuit decision has affected the EPA’s application of the regulations. Indeed, the EPA issued post-ADC guidance to Wa *419 ter Management Division Directors stating that “[t]he permitting authority will need to conduct an appropriate review of Phase II MS4s’ NOIs to ensure consistency with the permit.”[8]
Even assuming we could simply ignore that the EPA regulations have been vacated in relevant part, notwithstanding the majority’s conclusion that the State’s General Permit “concededly” complies with the EPA regulations, the fact is that the EPA regulations require implementation of best management practices consistent with the SWMP (see 40 CFR 122.34 [a] [“Implementation of best management practices consistent with the provisions of the storm water management program required pursuant to this section and the provisions of the permit required pursuant to § 122.33 constitutes compliance with the standard of reducing pollutants to the ‘maximum extent practicable’ ”]). Therefore, so long as DEC allows general permit coverage to an MS4 without ensuring the intended consistency between management practices and the individualized protocols set forth in the SWMP, the State is in violation of the CWA (see 33 USC § 1342 [p] [3] [B] [iii] [providing that MS4 permits “shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants”]).
It is undeniable that DEC has made efforts to adopt a general permit scheme that complies with the CWA and ECL, and which provides an administratively feasible approach to the difficult task of reducing stormwater pollutant discharges. Nevertheless, DEC’s current approach is legally impermissible. Of course, it is for the State, and not the judiciary, to establish the State’s review and assessment protocols (see Akpan v Koch, 75 NY2d 561, 570 [1990] [“courts may not substitute their judgment for that of the agency for it is not their role to weigh the desirability of any action or to choose among alternatives” (internal quotation marks and brackets omitted)]). It very well *420 may be that the State determines, as have other jurisdictions,[9] that review of the SWMP and the Plan is but one way by which the State may comprehensively and expeditiously comply with its regulatory mandate. How best to address this issue should be left to New York.
B. Public Participation Requirements
Petitioners argue that DEC violates statutory public participation requirements by failing to provide an opportunity for public comment and to request a public hearing on a MS4’s NOI and SWMP, prior to DEC’s authorization of coverage under the General Permit. DEC currently provides a full public notice and comment period and an opportunity to request a public hearing on the General Permit, and DEC also affords an additional 28-day pre-coverage public comment period with respect to each NOI (see General Permit at 8 [Part II. Obtaining Permit Coverage]). The majority concludes this meets all applicable legal requirements. I disagree and would find that the CWA and ECL require more pre-coverage public participation. Specifically, because the NOI and SWMP must contain the MS4s’ pollution controls, and the SWMP must be developed in advance of the NOI, which is then submitted to obtain coverage under the General Permit, DEC must provide an opportunity to request a public hearing for any particular NOI and SWMP.
Congress explicitly sought to encourage public participation in the development and implementation of the nation’s water pollution control measures, and required that the EPA and the states provide for, encourage, and assist with “[p]ublie participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the [EPA] or any State” (33 USC § 1251 [e]). The intended transparency of the process is reflected in the CWA *421 requirement that permit applications, and the NPDES and SP-DES permits themselves be made public (see 33 USC § 1342 |j']). With respect to the demand for administrative hearings, the CWA provides that the EPA may issue a permit “after opportunity for public hearing” (see 33 USC § 1342 [a] [1] [emphasis added]).
The ECL also mandates public participation with respect to SPDES coverage. State law requires “[p]ublic notice of a complete application for a SPDES permit” (ECL 17-0805 [1] [a]), which shall include “a statement that written comments or requests for a public hearing on the permit application . . . may be filed by a time and at a place specified” (ECL 17-0805 [1] [a] [ix]). The public comment shall last “not less than thirty days following the date of the public notice . . . during which time interested persons may submit their written views with respect to the application and the priority ranking of the permit” (ECL 17-0805 [1] [b]).
Petitioners argue that the public should have the opportunity to request a hearing on the contents of the NOI and SWMP because both contain the MS4’s pollution controls. Petitioners are correct that an MS4 must identify and list in the NOI its chosen management practices, and it must include in the SWMP the controls to reduce the discharge pollutants in accordance with the maximum extent practicable standard. Thus, the NOI and SWMP not only affirm that the MS4 will comply with the General Permit’s terms, but they also explain how the MS4s will meet legal requirements, based on the localities’ unique circumstances. Indeed, to ensure for itself that an MS4 understands its duties and obligations, the DEC must refer to the NOI and SWMP.
Here, DEC issued a General Permit for the specific purpose of allowing stormwater pollutant discharges by a covered MS4, where an MS4 has agreed to meet conditions set forth in the CWA, ECL, federal and state regulations, and the General Permit. A cursory review of the General Permit makes clear that it is not specific to any particular MS4, but rather it is generic, intended to set forth the minimum requirements identified by DEC, which must be complied with by every MS4 seeking coverage under the General Permit. However, as DEC has vigorously contended, general permit coverage is not automatic, but requires that the MS4 submit an NOI which DEC must then accept as complete.
*422 According to the General Permit, the NOI affirms that a SWMP has been developed. As the parties concede, the NOI and SWMP contain what DEC considers to be the mandatory limitations and measurable goals an MS4 proposes to implement in order to ensure stormwater pollutant discharge reduction to the maximum extent practicable, as required by the CWA. Clearly, then, submission of a completed NOI, based as it is on an initial SWMP, is the MS4’s entree to the general permit system, and is a necessary step to securing authorization to lawfully discharge pollutants in accordance with the CWA and ECL. If the NOI, and the prerequisite SWMP, do not constitute a permit application, then what other avenue does an MS4 have to secure permit coverage and authorization to lawfully discharge pollutants? The NOI and SWMP constitute an application in everything but name.
The DEC argues that the CWA and ECL public hearing requirements apply only to individual permit applications, and that public participation requirements are satisfied because the public has the opportunity to submit comments and request a public hearing regarding the General Permit itself. The EPA similarly argued in Texas Ind. Producers & Royalty Owners Assn. v Environmental Protection Agency (410 F3d 964 [7th Cir 2005]). In that case, the Seventh Circuit Court of Appeals agreed with the EPA that the CWA did not require the agency to provide a comment period or an opportunity to request a public hearing on NOIs and Storm Water Pollution Prevention Plans (SWPPP) submitted under the EPA’s “Final National Pollutant Discharge Elimination System General Permit for Storm Water Discharges From Construction Activities.” The court concluded that the CWA was ambiguous as to whether NOIs and SWPPPs are “permits” or “permit applications,” and in accordance with Chevron U.S.A. Inc. v Natural Resources Defense Council, Inc. (467 US 837 [1984]) judicially deferred to the EPA’s interpretation of those statutory terms (see Texas Ind. Producers, 410 F3d at 978). The court accepted as reasonable EPA’s argument that individual public hearings for NOIs and SWPPPs would eviscerate the administrative efficiency of the general permit scheme (id.).
In contrast, in EDC, the Ninth Circuit had previously rejected the EPA’s argument that the CWA public hearing opportunity requirement did not apply to NOIs because they are not “permits.” Instead, the Ninth Circuit held that the “NOI establishes what the discharger will do to reduce discharges to *423 the ‘maximum extent practicable’ ” and therefore is “functionally equivalent to a detailed application for an individualized permit” (344 F3d at 853).
The majority contends that the federal courts will have to resolve this “circuit split,” and concludes that DEC’s general permit scheme is permissible because it complies with the EPA’s regulations and New York’s law does not require more. I disagree because the majority’s conclusion is unsupportable on the record before us.
Notably, the EPA’s position in both cases is counter to the EPA’s own description in its stormwater regulations that a permit application is inclusive of “a notice of intent for coverage under a general permit” (40 CFR 122.34 [d] [1]). This inconsistency alone undermines the State’s argument that the NOI is something other than a permit or permit application.[10]
Additionally, the majority’s “hands-off” approach would leave this Court with no authority to consider the legality of state agency conduct. That is most certainly not the law, as made plain by this Court’s administrative law jurisprudence (see Seittelman v Sabol, 91 NY2d 618, 625 [1998] [invalidating state regulation that was “inconsistent with the controlling Federal statute it was intended to implement”]; see also Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980] [the Court affords an agency no deference if its interpretive regulations “run( ) counter to the clear wording of a statutory provision”]; Matter of Raritan Dev. Corp. v Silva, 91 NY2d 98, 100 [1997] [holding that “when an (agency) interpretation is contrary to the plain meaning of the statutory language,” the court may overrule and “decline( ) to enforce an agency’s conflicting application thereof”]; Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of *424 Health & Mental Hygiene, 23 NY3d 681 [2014] [striking down the New York City Board of Health’s restriction on soda portions as exceeding its regulatory authority given by the legislature]).[11] Moreover, absent binding precedent from the United States Supreme Court, there is no legal impediment to this Court interpreting federal law (see Flanagan v PrudentialBache Sec., 67 NY2d 500, 506 [1986] [“When there is neither decision of the Supreme Court nor uniformity in the decisions of the lower Federal courts ... a State court required to interpret (a) Federal statute has the same responsibility as the lower Federal courts and is not precluded from exercising its own judgment”]).
We should reject DEC’s argument because under the general permit scheme the NOI and SWMP replace an individual permit application. To adopt approvingly DEC’s position, and EPA’s argument in Texas Ind. Producers, fails to sufficiently interrogate the general permit regulatory scheme, or fully appreciate the role of the general public in the general permitting process. Moreover, the Court’s conclusion that requiring public hearings for each individual NOI and SWPPP would be inconsistent with congressional intent is not supported by the language of the CWA. The stated purpose of that statute is to restore and maintain the integrity of the nation’s waters, eliminate the discharge of pollutants into navigable waters, and ensure public participation in the development and implementation of any “plan or program” administered under the CWA by the states. While there may be administrative efficiencies *425 supporting the use of a general permit scheme, they do not outweigh the explicit objectives and goals of the CWA to protect the country’s waters. In any event, because the EPA regulations allow for individual permits even where a general permit is in place, the efficiency argument propounded by the DEC and EPA is underwhelming (see 40 CFR 122.28 [b] [3] [i]).
What is actually counter to the intent of the CWA is to provide an opportunity to request a public hearing in cases involving individual permits, while denying the same under a statewide general permit scheme involving pollutant discharges from hundreds of MS4s. The latter potentially implicates the integrity of local water bodies more significantly than the actions of any single polluter, and therefore requires the type of public scrutiny and engagement envisioned by the CWA (see 33 USC § 1342 [a] [1] [the EPA may issue a NPDES permit only “after opportunity for public hearing”]).
Therefore, DEC’s determination that neither the CWA nor the ECL requires an opportunity for a public hearing on the NOIs and SWMPs, prior to DEC granting permit coverage, ignores the obvious purpose and role of these documents, and undermines the CWA’s public participation requirement. As such, DEC’s interpretation is not entitled to deference, and is, for the reasons I have stated, arbitrary and capricious. Therefore, the NOI and SWMP should be subject to statutory public participation requirements that include the opportunity to request a public hearing.
IV.
Accordingly, the 2010 General Permit does not provide for adequate review of NOIs or meaningful public participation in accordance with the CWA. Thus, I would modify the Appellate Division order to remit the Permit to DEC for compliance. I agree with the majority that petitioners’ remaining contentions are without merit (see majority op at 397).
Judges Pigott, Abdus-Salaam and Stein concur; Judge Rivera dissents in part in an opinion in which Chief Judge Lippman and Judge Fahey concur.
Order, insofar as appealed from, affirmed, with costs.

. The CWA defines point sources as “any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, *400 tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged” (33 USC § 1362 [14]; see also 40 CFR 122.2).

. Hence, explaining 1991 legislation wherein Congress mandated that the EPA “issue final regulations with respect to general permits for stormwater discharges associated with industrial activity on or before February 1, 1992” (Pub L 102-240, § 1068, 105 US Stat 1914, 2008 [Dec. 18, 1991]). In response, EPA implemented a general permit system for stormwater discharges from industrial activities (see National Pollutant Discharge Elimination System General Permits and Reporting Requirements for Storm Water Discharges Associated with Industrial Activity, 56 Fed Reg 40948-01).

. In anticipation of the General Permit’s expiration on April 30, 2010, DEC sent a public notice of an interim draft renewal, effective for two years.

. The Plan may be created individually or with a group of covered municipalities, and is a separate document, not to be submitted with the NOI (see General Permit at 96 [Part X. Acronyms and Definitions]).

. For example, with respect to the minimum control measure “Illicit Discharge Detection and Elimination,” the NOI form requires the MS4 include in its SWMP the following management practices:
“Develop, implement and enforce a program to detect and eliminate illicit discharges to the MS4”
• “Outfall and storm sewershed boundary mapping”
. “Field verify outfalls”
. “Outfall reconnaissance inventory”
• “Prohibit illicit discharges”
. “Public, employees, businesses informed of hazards of illicit discharge”
• “Adopt and enforce local law to prohibit illicit discharges”
« “Adopt available mechanisms to prohibit illicit discharges”
(see New York State Department of Environmental Conservation, Phase II SPDES General Permit for Storm Water Discharges from Municipal Separate Storm Sewer Systems [MS4s], Notice of Intent at 8 [hereinafter NOI]).
In addition to the required practices, the NOI lists, by short phrases, several optional management practices for the applicant to consider adopting:
. “System mapping”
• “Address exempt non-stormwater discharges as necessary”
. “Dye testing”
• “Shoreline surveys”
. “System inspections” (id.).

. DEC contends it reviews every NOI before accepting it. However, DEC can point to only three instances in which it has rejected an NOI under the 2010 General Permit. In all three, the offending MS4 failed to identify certain best management practices that it is implementing or intends to implement. Stated differently, DEC has only rejected NOIs where the MS4 left portions of the NOI’s menu blank. Despite DEC’s contention to the contrary, this “review” hardly amounts to anything more than a “rubber stamp.”

. The majority treats Waterkeeper similarly, relegating it to a footnote because that decision, “however interpreted, does not eliminate the circuit split” (see majority op at 394 n 14).

. This guidance pre-dates the Seventh Circuit’s decision in Texas Ind. Producers & Royalty Owners Assn. v Environmental Protection Agency (410 F3d 964 [7th Cir 2005]) which held, contrary to the Ninth Circuit, that NOIs are not subject to the CWA public participation requirements. However, the EPA guidance has not been rescinded and there is nothing to suggest the obsolescence of the guidance with respect to agencies ensuring consistency with the permit and compliance with the CWA.

. Texas and Mississippi, for example, require the submission of a full SWMP contemporaneously with the filing of an NOI for substantive review (see Texas Commission on Environmental Quality, General Permit to Discharge under the Texas Pollutant Discharge Elimination System part II [E] [1] [2013] available at https://www.tceq.texas.gov/assets/public/permitting/ stormwater/txr040000_issued_permit.pdf [accessed Apr. 13, 2015]; Mississippi Department of Environmental Quality, Small Municipal Separate Storm Sewer System [MS4] General Permit, Condition S-l [2009], available at http://www.deq.state.ms.us/mdeq.nsf/pdf/epd_MS4PhaseIIStormWater GeneralPermit/$File/22General.pdf?OpenElement [accessed Apr. 14, 2015]).

. The majority holds that while 40 CFR 122.34 “does not appear facially consistent” with the EPA’s position in EDC and Texas Ind. Producers, that section of the EPA’s regulations is part of a “question and answer” format intended to clarify requirements applicable to regulated small MS4s (see majority op at 394 n 15). Therefore, according to the majority, it is for the federal courts to determine whether the regulations are inconsistent with the EPA’s position in those federal cases. However, whether the EPAhas taken a position at odds with what DEC now asserts is the correct and intended interpretation of the federal regulations is, of course, relevant to this Court’s analysis of DEC’s defense to petitioners’ claims. Turning to the regulations, it is clear from the text of 40 CFR 122.34 (d) (1) that a small MS4’s NOI is a general permit application. Notwithstanding the majority’s word play, there is no avoiding that the federal regulations are inconsistent with the EPA’s position in EDC and Texas Ind. Producers.

. The majority argues that DEC, as the permitting agency, must follow the EPA’s interpretation of the CWA, but contends that I suggest every state’s high court may second-guess the EPA (see majority op at 395 n 16). However, my point is not that we can decide counter to the EPA, but rather that the Ninth Circuit already has, and we cannot ignore that fact or the Ninth Circuit’s analysis, even if DEC and the majority would have it otherwise.
There is also no support for the majority’s concern that our review poses a potential “impediment to implementation of a coherent nationwide NPDES permitting scheme” (id.). The EPA provides that while SPDES permits must comply with federal regulations and the CWA, “[n]othing in [the regulations] precludes a State from . . . [a]dopting or enforcing requirements which are more stringent or more extensive than those required [by the EPA]” (40 CFR 123.1 [h] [i] [1]). Nor is there a legal impediment to “[o]perating a program with greater scope of coverage than that required [by the federal regulations]” (40 CFR 123.1 [h] [i] [2]). Indeed, the EPA expressly requires MS4s to “comply with any more stringent effluent limitations in [their State-issued] permit” (40 CFR 122.34 [e] [1]). It would appear, then, that differences among the circuit courts are the more likely obstacles to national uniformity.